**TELXON CORPORATION, Plaintiff,**

v.

**SYMBOL TECHNOLOGIES, INC., Defendant.**

**No. 5:96 CV 1911.**

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 18, 1996.

Richard S. Mitchell, Robert A. Goodman, Sergio Anthony Carano, Goodman, Weiss, Miller, L.L.P., Cleveland, OH, for Plaintiff.

Hugh E. McKay, Porter, Wright, Morris & Arthur, Cleveland, OH, Philip S. Van Der Weele, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, OR, for Defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION

Plaintiff Telxon Corporation ("Telxon") has filed a motion for preliminary injunction and an amended motion for preliminary injunction (Docket Nos. 3 and 40).[1] Defendant Symbol Technologies, Inc. ("Symbol") has opposed the motion, as amended. (Docket No. 64).[2]

On November 6, 1996, the Court conducted a hearing on the motion, as amended.[3] Following the hearing, the parties were directed to submit briefs on the issue of likelihood of success as it related to three of the six alleged false statements made by Symbol: (1) its product's compliance with IEEE 802.11; (2) the issue of an open system; and (3) the issue of interoperability. The Court also requested that counsel provide proposed findings of fact on the sole issue of likelihood

of success. These documents have been filed. (Docket Nos. 78, 79, 81 and 84).[4] The motion is now ripe for determination.

### II. THE PARTIES' POSITIONS WITH RESPECT TO THE MOTION FOR PRELIMINARY INJUNCTION

This case arises out of allegedly false statements made by Symbol about the performance of products manufactured by both Telxon and Symbol for use in wireless computer networks.[5] Telxon asserts that Symbol's false and misleading statements violate the Lanham Act, § 43(a), 15 U.S.C. § 1125(a), and the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.02. The statements about which Telxon complains can be arranged into six general categories:

(1) Direct sequence is obsolete and not available under the IEEE 802.11 D4 standard.

(2) Symbol's frequency hopping network can be made compliant with IEEE 802.11 by a software upgrade.

(3) Telxon will not be able to deliver frequency hopping networks for six to twelve months.

(4) Symbol's frequency hopping products are interoperable.

(5) Symbol's frequency hopping network is compliant with the IEEE 802.11 specifications.

(6) Symbol's frequency hopping network is an open system.

Symbol has not only opposed the motion, it has filed its own "Precautionary Motion" (Docket No. 85) for leave to file the supplemental exhibits and declarations contained in Docket No. 79.

The Court has addressed these two motions (Docket Nos. 83 and 85) in a separate order wherein it granted Telxon's motion and denied Symbol's. Therefore, Docket No. 79 has not been considered in the resolution of the motion for preliminary injunction, nor has any argument relating solely to the exhibits and/or declarations contained in Docket No. 79.

---

1. Other supporting documents filed by the plaintiff include Docket Nos. 68, 69 and 76.

2. Other supporting documents filed by the defendant include Docket Nos. 65, 66 and 67.

3. A transcript of the hearing has been filed. (Docket No. 77).

4. Telxon filed a motion (Docket No. 83) to strike portions of Symbol's post-hearing submissions, specifically Defendant's Supplemental Exhibits and Declarations in Opposition to Plaintiff's Motion for Preliminary Injunction (Docket No. 79), which document is referred to in Symbol's post-hearing memorandum (Docket No. 78) at pages 1–6, 9–12, 14, 15, 22, 25, 27–33, 35, 37 and 39–41. Telxon argues that the additional submissions go far beyond this Court's order of November 6, 1996.

5. In essence, these are computer networks that communicate (or "talk") through radio airwaves instead of wires. Telxon's product is known as ARLAN 3000; Symbol's product is the Spectrum24 ™.

Telxon seeks an order enjoining Symbol from making these statements.

### III. DISCUSSION

#### (Including Findings of Fact and Conclusions of Law )

#### A. Standard for Granting a Preliminary Injunction

There is a well-established test for determining whether to grant a preliminary injunction. It requires the court to weigh and balance four factors:

 1) Whether the [movant has] shown a strong or substantial likelihood or probability of success on the merits;

 2) Whether the [movant has] shown irreparable injury;

 3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

 4) Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). These criteria "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Tate v. Frey,* 735 F.2d 986, 990 (6th Cir.1984) (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982)). They are "factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

#### B. Findings of Fact

##### General Background

1. Telxon designs, manufactures, integrates and markets wireless and mobile transaction systems and solutions.

2. Telxon's portable tele-transaction computers ("PTCs") and its wireless local area network ("LAN") systems are integrated with customer-specific enterprise computer systems and third-party wide area networks ("WANs"), enabling mobile workers to process data on a real time basis at the point of transaction.

3. Customers of Telxon's systems gather, process, store and communicate data between their centralized management information systems and remote or mobile employees who collect the data or process transactions in batch or on-line mode.

4. Telxon competes head-to-head with Symbol for the sale of wireless networks. *See* Exhibit X.[6]

5. Telxon and Symbol have about 60 percent of the market for wireless computer networks. *See* Hearing Transcript, p. 36.

6. The products at issue in this litigation are Telxon's and Symbol's wireless computer networks.[7]

7. In essence, these are computer networks that communicate or "talk" through radio airwaves instead of wires.

8. Symbol's frequency hopping wireless network is known as Spectrum 24.

9. Frederick P. Heiman ("Heiman") is Symbol's Executive Vice President and a member of its Board of Directors and he is Symbol's primary spokesperson and deponent in this controversy.

##### Wireless Networks

10. The components of a wireless network (including Spectrum 24) are access points, mobile units,[8] the radio cards that go inside of the mobile unit, and

---

**6.** The references to *"See* Exhibit" followed by a *letter* refer to Exhibits to plaintiff Telxon Corporation's supplemental brief in support of its motion for preliminary injunction. References to *"See* Exhibit" followed by a *number* refer to exhibits submitted by defendant Symbol Technologies, Inc. in opposition to plaintiff's motion for preliminary injunction.

**7.** Wireless computer networks are also referred to as wireless local area networks or wireless LANs.

**8.** Mobile units are also referred to as terminals. "An example of a mobile unit is a hand-held computer . . . with a radio in it." Heiman Declaration, p. 2. At the preliminary injunction hearing, the mobile unit used for demonstration purposes by Telxon's counsel was a Telxon hand-held computer.

software. *See* Exhibit F, Heiman Deposition, pp. 61–62; Exhibit A, Mathias Affidavit, ¶¶ 34–35; Heiman Declaration, p. 2.

11. A diagram of a wireless network is attached. *See* Appendix 1.[9]

12. The individual user holds the mobile unit.

13. There is no physical wire going from the mobile unit to the rest of the network.

14. The access point (as pictured in the diagram) is attached to the network by a wire.

15. The mobile unit has a radio in it.

16. The radio in the mobile unit communicates or "talks" to an access point.

17. This communication through the air (as opposed to over a wire) from the mobile unit to the access point is referred to as the "airwave communication."

18. The communication received by the access point from the mobile unit is then transmitted through the wired portion of the network back to the host or server.

19. The host stores the information for use by others on the network. *See* Exhibit A, Mathias Affidavit, ¶¶ 34–36; *see also* Hearing Transcript, pp. 27–30.

20. As the person holding the mobile unit (in the diagram) moves from one circle (referred to as a "microcell") to another, the mobile unit changes the access point that it communicates with.

21. That is, the mobile unit wireless connection is handed off from one microcell to another.

22. The movement from one microcell to another is called "roaming."

23. The access points communicate or "talk" with each other.

24. The communication between access points is separate and distinct from the airwave communication that takes place between an access point and a mobile unit. *See* Exhibit A, Mathias Affidavit, ¶¶ 34–38.[10]

25. Avis is a real life example of a Telxon wireless network.

26. In the Avis application, a customer is greeted by an Avis employee when the customer exits the rental car.

27. The Avis employee is holding a mobile unit that instantly provides a receipt to the customer.

28. The mobile unit instantly transmits information through radio waves (the airwave communication) to access points.

29. As to Avis,[11] the access points take that information and send it to the host computer located in New Jersey. *See* Hearing Transcript, p. 31.

*Standards and the Institute of Electrical and Electronic Engineers.*

30. A "standard" is a model or blueprint that is established by a recognized group or authority for the design of a computer product.

31. By definition, the *standard* places the design in the public domain so that any vendor (*e.g.*, Telxon or Symbol) can design its products to comply with the *standard*.

32. When a *standard* does not exist, vendors develop their own proprietary or customized computer product.

33. The design for such proprietary products is not published in the public domain and remains confidential to a specific vendor. *See* Exhibit A, Mathias Affidavit, ¶¶ 11–13.

**9.** This diagram was attached to the Mathias Affidavit as Exhibit 3.

**10.** In his Declaration, Heiman correctly states that wireless networks are similar in concept to cellular telephone networks. "The relevant difference between the two is the size of the territory covered. A cellular telephone network may cover an entire city or more, whereas a wireless LAN typically covers only a single establishment like a supermarket or department store." *See* Heiman Declaration, p. 2.

**11.** During the hearing, the Court made reference to its recent experience in returning a rented car wherein a hand-held portable tele-transaction computer was apparently used to provide the Court, almost instantaneously, a printout of the bill for the rental car.

34. The Institute of Electrical and Electronic Engineers ("IEEE") is a world-wide technical professional society devoted to advancing the theory and application of electrical engineering, electronics and computer science.

35. One of the functions of the Institute is to develop standards.

36. IEEE 802.11 is the proposed standard that is being developed for wireless networks.

37. The draft standard contains specifications for two types of radios: frequency hopping and direct sequence. See Exhibit A, Mathias Affidavit, ¶¶ 20–31; Exhibit B, Salem Affidavit, ¶ 2.

38. The proposed IEEE 802.11 standard tells a vendor how to build the radio contained in a mobile unit so that the radio can communicate with an access point.

39. This process has been previously described above (*See* FF 17; *see also* FF 11–19) as the "airwave communication." *See* Exhibit A, Mathias Affidavit, ¶¶ 35–36; Heiman Declaration, pp. 3, 15–17.

40. The proposed IEEE 802.11 standard does not tell a vendor how to build its products so that access points can communicate with each other.

41. The communication between access points is not addressed.

42. The communication between access points will remain proprietary to each vendor unless and until an additional and separate standard is developed for that purpose. *See* Exhibit A, Mathias Affidavit, ¶¶ 10(e), 35–36; Exhibit F, Heiman Deposition, pp. 92, 142; Heiman Declaration, pp. 16–17.

43. There is no dispute that the IEEE 802.11 standard is still a proposed draft, and it has not been completed.[12]

44. IEEE 802.11 is still subject to "technical changes."

45. For a standard to be approved, it must go through "a rigorous review and approval process."

46. This process includes many interim levels of review before the draft becomes final.

47. Draft 5 is the current draft of IEEE 802.11.

48. The cover page for the standard (dated July 19, 1996) states in bold print: **"Do not claim compliance to this unapproved draft standard."** (Emphasis in original.)

49. The title page continues: "This is an unapproved IEEE Standard Draft subject to change." *See* Exhibit V; Exhibit A, Mathias Affidavit, ¶ 29.

50. Draft 4 contains the same admonition as Draft 5. *See* Exhibit A, Mathias Affidavit, ¶ 29.

*An Open System*

51. A computer product is considered an open system when it is *built to a published standard,* such as IEEE. *See* Exhibit A, Mathias Affidavit, ¶ 18.

52. Telxon does not dispute Symbol's definition and description of an open system.

53. These definitions are consistently found in Symbol's sales literature and in the testimony of Heiman:

The simplest and most general definition of an open system is one where multiple vendors using multiple protocols[13] can communicate with each other. *In other words. an open system is vendor-independent and designed to interconnect with a variety or products.* [Emphasis added.]

*See* Exhibit CC, Symbol's Spectrum 24 Sales Kit.

An open system is one in which a third-party terminal can operate on the Symbol network. Then *the Symbol network would be open if a third-party terminal*

---

**12.** Andrew Salem ("Salem"), the Managing Director of Standard Activities for the IEEE, testified that IEEE 802.11 has not been completed.

**13.** A protocol is a set of rules for communication between computers. Without these rules, computers are not able to understand each other. *See* Exhibit H, Symbol's Answer to First Amended Complaint, ¶ 12.

*made by another manufacturer can communicate with that network.* [Emphasis added.]

*See* Exhibit F, Heiman Deposition, p. 53; Hearing Transcript, p. 43. (*See also* Hearing Transcript p. 50 where Heiman states that this definition is correct.)

If a Telxon terminal with a Telxon manufactured radio card could communicate to a Symbol ... access point over the airwaves, that would deem it as an open network.

*See* Exhibit 50, Heiman Deposition, p. 54.

54. A computer product or network is not an open system when it is proprietary. *See* Exhibit A, Mathias Affidavit, ¶ 18.

55. "Proprietary is generally regarded in the industry as the opposite of open." *See* Heiman Declaration, p. 31.

56. Having an open system "means that third parties can develop products that can 'interoperate' with the system in question...." *See* Heiman Declaration, p. 28 at n. 1.

57. A computer product that is built to a standard is considered an open system.

58. An open system may provide the ground work for interoperability (defined below at FF 59ff); whereas, a proprietary (or closed) system will not be interoperable.

*The Interoperable Computer Products.*

59. If a customer can substitute one vendor's computer product with the product of another vendor, then those products are "interoperable."

60. This concept has been referred to as the ability to "plug and play" different vendors' products. *See* Exhibit AA (Heiman defining "interoperable" in a magazine article).

61. By contrast, if there is no interoperability, then all of the products must be purchased from a single vendor. *See* Exhibit A, Mathias Affidavit, ¶ 16.

62. Telxon does not dispute the definition of "airwaves interoperability" set forth in Heiman's Declaration:

Airwaves interoperability refers to communication over the airwaves between mobile units and access points. Airwaves interoperability means that if Manufacturer A's access points comply with the IEEE 802.11 standard, then mobile units manufactured by Manufacturer B but which also comply with the 802.11 standard have the ability to communicate with A's access points.

*See* Heiman Declaration, p. 3. *See also* Heiman Declaration, p. 16.

63. "Interoperability between access points" simply means that access points manufactured by different vendors can be used interchangeably in a computer network. *See* Heiman Declaration, p. 16; Exhibit A, Mathias Affidavit, ¶¶ 35–37.

64. Airwaves interoperability is a very important form of interoperability to wireless network users.[14]

*The Significance of Standards, Open Systems and Interoperability.*

65. Customers look to purchase computer products and networks that comply to a standard and are open and interoperable.

66. From the point of view of a customer, interoperability is important because it helps ensure the continued availability of products from a variety of sources; otherwise, a customer could be at risk in its ongoing ability to purchase products for its network. A customer that is limited to a single source risks the possibility that the vendor will go out of business or simply stop manufacturing the product. *See* Exhibit A, Mathias Affidavit, ¶ 17.

67. Interoperability is desired by customers and customers are more comfortable with a standard. *See* Exhibit F, Heiman Deposition, pp. 87–89.

---

**14.** Some people consider it the *most* important form of interoperability. *See* Heiman Declaration, p. 18.

68. In its Spectrum 24 Sales Kit, Symbol explains the significance of open systems architectures:

Not too long ago, building an enterprise-wide network meant that you selected a single vendor and implemented that vendor's networking product line throughout your company. You are then tied to that vendor and that vendor's product line for the life of the application. Rewriting the application for a different vendor was just too costly. For this reason, multi-vendor interoperability and inter-networking is on the mind of every IS or IT manager and drives the open systems paradigm.

*See* Exhibit CC.

### Symbol's False Claim of Compliance

69. Symbol has announced to the world that its frequency hopping network, Spectrum 24, is compliant with or meets the IEEE 802.11 specifications by its two-page color advertisement that has been distributed throughout the world in the August–October 1996 time frame.[15] *See* Exhibit I.

70. After a brief introduction of Spectrum 24, the advertisement contains a bolded headline stating: Meets newly approved IEEE 802.11 specs.

71. Other sections of the advertisement refer to the "approved 802.11 spec" and declare IEEE 802.11 has been "newly endorsed." *See* Exhibit I.

72. Symbol *admits* that the statement "meets newly approved IEEE 802.11 specs" is false.[16]

73. Symbol is forced to make this admission because Spectrum 24 is *not* compliant with IEEE 802.11 D4 or D5, the current *draft* of the standard. *See* Exhibit K, Defendant's Response to Plaintiff's Second Request for Admissions at Response Nos. 4 and 5.

74. After this case was filed, Heiman called Symbol's Vice President of Marketing and advised him that the headline was inaccurate and instructed him to modify the language. *See* Exhibit F, Heiman Deposition, pp. 118–119.

75. Symbol has now modified its advertisement: [17]

| Old Language | New Language |
| --- | --- |
| Meets newly approved IEEE 802.11 specs. | High performance, high throughput. |
| Newly endorsed. | Forthcoming. |
| Approved IEEE 802.11 spec | Forthcoming … standard |

76. During the preliminary injunction hearing, Symbol conceded that the advertisement [Exhibit I] was a mistake.

77. Symbol further stated that it has not made any other claims of compliance.

78. This advertisement, however, was not the only time that Symbol has claimed compliance with IEEE 802.11.[18]

---

15. The advertisement appeared in the following magazines: WIRELESS FOR THE CORPORATE USER (July/August 1996); AUTO ID NEWS U.S. (September 1996); AUTO ID NEWS LATIN AMERICA (September 1996); AUTO ID NEWS EUROPE (September 1996); CHAIN STORE AGE EXEC. (September 1996); DATAMATION (World–Wide edition, September 1996); LAN MAGAZINE (October 1996); INTEROPERABILITY (October 1996). *See* Exhibit J, Defendant's Response to Plaintiff's First Set of Interrogatories to Defendant Symbol Technologies, Inc. at Response No. 3.

16. *See* Exhibit K, Defendant's Response to Plaintiff's Second Request for Admissions at Response No. 16.

17. *See* Exhibit J, Defendant's Response to Plaintiff's First Set of Interrogatories to Defendant Symbol Technologies, Inc. at Response No. 4; Exhibit L; Exhibit M.

18. For example:

(1) in his deposition, Heiman acknowledge that he has seen Symbol literature and presentations that improperly state that Symbol is compliant with IEEE 802.11. *See* Exhibit F. Heiman Deposition, pp. 96–97.

(2) In a Symbol customer presentation chart comparing Telxon's wireless network to Symbol's Spectrum 24, the chart has a line item designated as "802.11 compatible." Next to the Telxon product it says "no" and next to the Symbol product it says "yes [compatible]." *See* Exhibit Q at D1140.

(3) Symbol has sent letters to its customers or prospects claiming compliance: "The IEEE spec is in its final draft now. We are totally compliant with it." Symbol also makes a point of saying in this letter that Telxon is not compliant. *See* Exhibit O. Defendant's Response to Plaintiff's Second Request for Production of Documents at Response No. 19 permits a presumption that Symbol has sent

79. It is undisputed that Symbol has repeatedly represented that Spectrum 24 is compliant with IEEE 802.11 and its claims of compliance are false.

80. Symbol has been successful in confusing the public with respect to its claimed compliance with IEEE 802.11.

81. Various magazines and analysts have echoed Symbol's claims of compliance.[19]

82. It is clear that Symbol has been successful in making the public believe that it is compliant.

83. It is confusing and misleading to claim compliance to a draft standard because until the standard is finalized, it is subject to technical changes and no standard exists.[20]

84. The standard itself states: "This is an unapproved draft of a proposed IEEE Standard, subject to change.... Do not claim compliance to this unapproved draft standard." *See* Exhibit V.

85. In June 1995, Symbol spoke with IEEE about how to refer to the standard.

86. Symbol was told that it could not claim compliance. *See* Hearing Transcript, pp. 20–21.

87. IEEE has instructed Symbol to stop claiming compliance with the draft standard.

88. On October 27, 1995, IEEE sent a letter to Symbol stating that Symbol has been claiming compliance to the standard and that it should not "claim conformance to [the] IEEE standard."

89. The October 27, 1995 letter concludes: "We believe that it is in the best interest of your customers to ensure that references to IEEE documents provide accurate information on your product." *See* Exhibit D, Rowden Affidavit at Exhibit A. Symbol never responded to this letter. *See* Exhibit D, Rowden Affidavit.

90. At the preliminary injunction hearing, Heiman repeatedly stated that Symbol does "not want to claim compliance" and that it agrees that it "should not claim compliance." *See* Hearing Transcript, pp. 18–20.

*Symbol's False Claim of Open System.*

91. Symbol has announced that Spectrum 24 is an open system.[21]

---

countless similar letters to its customers or prospects. *See* Exhibit N.

(4) Heiman is responsible for making presentations to Symbol's "big customers." He uses slides and gives handouts to customers. *See* Exhibit F, Heiman Deposition, p. 33. His presentations include claims of compliance: "Conforms to open systems and IEEE 802.11 standard." *See* Exhibit P. Once again, during his deposition, Heiman noted that this "is an inaccurate statement." *See* Exhibit F, Heiman Deposition, p. 103. *See also* Exhibit Q.

**19.** For example:

(1) "It [Spectrum 24] is compliant with IEEE 802.11 standard." COMPUTER INDUSTRY UPDATE, July 1995. *See* Exhibit R.

(2) "The system [Spectrum 24] complies with the IEEE's 802.11 WLAN standard for open systems interoperability." AUTOMATIC ID NEWS, December 1995. *See* Exhibit

(3) "Symbol's Spectrum 24 wireless LAN is already in compliance with IEEE 802.11...." LEHMAN BROTHERS ANALYST REPORT, June 27, 1996. *See* Exhibit T.

(4) "Symbol ... already complies [with the IEEE standard]." FURMAN SELZ ANALYST REPORT, July 19, 1996. *See* Exhibit U.

**20.** *See* Exhibit A, Mathias Affidavit; Exhibit C, Salem Affidavit; Exhibit D, Rowden Affidavit.

**21.** Examples of Symbol's claim that Spectrum 24 is an open system are as follows:

(1) In the Symbol two-page advertisement that has been distributed around the world (*see* FF 69 above, Exhibit I), it contains the bolded headline: **Symbol's Open System Means a Riskless Investment.**

(2) "The Spectrum 24 Sales Kit contains a copy of ... slides used by Symbol sales people in competitive sales presentations.... (Exhibit 42, pp. 2, 3)." *See* Heiman Declaration, pp. 22–23. This slide prominently displays a circle-like emblem that contains the phrase: "Spectrum 24 Open Systems." *See* Exhibit 42.

(3) On most of Symbol's sales literature there is a circle-like emblem that contains the phrase: "Spectrum 24 Open Systems." *See* Exhibit DD.

(4) Symbol's customer presentations assert that Spectrum 24 "conforms to *open systems* and IEEE 802.11 standards." (Emphasis added.) *See* Exhibit Q at D1135.

92. Spectrum 24 is not an open system *by Symbol's own definition.* *See* FF 51–55 above.

93. Telxon does not dispute Symbol's definition.

94. Symbol's claim that Spectrum 24 is an open system is false.[22]

95. At the preliminary injunction hearing, Heiman restated that open "means in the industry that you can use third-party products ... not just products made by that manufacturer, to interface with it."[23] Hearing Transcript, p. 43.

96. Heiman also restated that "there is nothing open about" Spectrum 24 because the mobile unit is not going to work unless the access point is purchased from the same manufacturer. *See* Hearing Transcript, pp. 43–44.

97. At the preliminary injunction hearing, Heiman once again admitted that Spectrum 24 *is not an open wireless network.*[24]

98. The whole purpose of IEEE 802.11 is to develop a standard for airwave communications.

99. From a customer's point of view, this is the most important aspect of Spectrum 24.

100. No place in its advertising does Symbol disclose that Spectrum 24 is not open in the only important meaning of the term.

101. Symbol—by its own definition—admits that Spectrum 24 is proprietary in its airwaves communications.

102. Symbol admits that it is not an open system.

*Symbol's False Claim of Interoperability.*

103. Symbol has announced that compliance with IEEE 802.11 will result in interoperability of its frequency hopping products with other vendors that are compliant with the standard.

104. Telxon has established that Symbol is making false claims regarding interoperability as follows: (a) by claiming that IEEE 802.11 is an interoperability standard; (b) by claiming that compliance with the final IEEE 802.11 standard will result in airwaves interoperability; and (c) by claiming that compliance with the final IEEE 802.11 standard will result in access point interoperability.

105. The standard has not been finalized.

106. There can be no interoperability based on a non-existent standard. *See* Exhibit A, Mathias Affidavit.

107. Even after the standard is finalized, compliance with it will not result in interoperability. *See* Exhibit A, Mathias Affidavit, ¶¶ 10(d), 32, 33.

108. Compliant vendors will need to work together before interoperability can be achieved.

109. Without this step, there will be no interoperability among vendors.

110. In addition, interoperability testing must take place among vendors before they can claim interoperability.

111. The methodology for such interoperability testing has not been written. *See* Exhibit A, Mathias Affidavit, ¶ 25.

112. IEEE 802.11 is not designed to provide full interoperability of a wireless network.

---

**22.** *See, e.g.,* Exhibit F, Heiman Deposition, pp. 62–65. *See also* Heiman Declaration, p. 31; Exhibit A, Mathias Affidavit; Exhibit K, Defendant's Response to Plaintiff's Second Request for Admissions at 15.

**23.** "Interface" refers to how two computer components exchange information. *See* Exhibit A, Mathias Affidavit, ¶ 11.

**24.** "The only point in this whole network that we don't conform to is the wireless part." Hearing Transcript, p. 49. Symbol argues that Spectrum 24 is partially open because it is open at interfaces that are unrelated to the wireless network. Symbol, however, does not advertise that it is partially open. In any event, that argument must fail because Symbol is not open by its own definition in the only relevant aspect of a wireless network.

113. IEEE 802.11 only provides a proposed standard for communication between a mobile unit and access points.

114. IEEE 802.11 does not contain any specifications for communicating between access points.

115. Because there is no standard for communications between access points, there cannot be interoperability between access points.[25]

116. In light of the above findings, Symbol's claims of interoperability are false.

*Injury to Telxon.*

117. Symbol's continued claims of compliance, open systems and interoperability will lead consumers to believe that Symbol has a product that is competitively superior to Telxon's similar products.

118. The IEEE has told Symbol not to claim compliance because it "wants to protect the consumers from receiving false, misleading or confusing information. . . ." *See* Exhibit D, Rowden Affidavit, ¶ 12.

119. Because of the complexity of these products, customers look to purchase computer products and networks that comply to a standard.

120. Customers will often times delay purchasing decisions until a standard has been developed. See Exhibit A, Mathias Affidavit, § 12–13.

121. Symbol's advertising campaign is geared towards making customers and prospects believe that they no longer need to delay their purchasing decisions because, as Symbol falsely claims, Spectrum 24 *is compliant, open* and *interoperable.*

122. Those statements are false on their face.

123. Telxon and Symbol compete head-to-head in the same market, and it is quite likely that Symbol's assertions of competitive superiority, if permitted to continue, will result in lost sales to Telxon.

**25.** *See* Exhibit F, Heiman Deposition, pp. 92,

## C. Applicable Law

The Lanham Act, 15 U.S.C. § 1125(a)(1)(B), provides in relevant part:

(a) Civil action; any person

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

\* \* \* \* \* \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Under the Lanham Act, injunctive relief is appropriate. *See* 15 U.S.C. § 1116(a).

## D. Conclusions of Law

### 1. Likelihood of Success on the Merits

▮ The Sixth Circuit has not addressed the elements necessary to prove a Lanham Act claim. However, as pointed out by another Judge of this Court, recent case law establishes that the following must be shown in order to prevail:

(1) the advertisements at issue are false or misleading and the advertisements actually deceived or had the tendency to deceive a substantial segment of the audience,

(2) the deceptive or misleading portions of the advertisement were material, in other words they were likely to influence the purchasing decision,

(3) defendant caused the advertised goods to enter interstate commerce, and

(4) plaintiff has been or is likely to be injured either by direct diversion of sales from itself to defendant or by lessening the goodwill or acceptability its products enjoy with the buying public.

142; Exhibit A, Mathias Affidavit, ¶ 10(c).

*Hobart Corp. v. Welbilt Corp.*, 1989 WL 449696 (Oct. 4, 1989 N.D.Ohio) (quoting *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 213 (D.D.C.1989) (citing *Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777, 783 (N.D.Ill.1974)); *U–Haul Int'l. Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1243 (D.Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir.1982)).

The case law makes clear that liability under the Lanham Act is not limited solely to descriptions which are literally false. "[A] mere showing that advertisements tend to create a false impression is sufficient to warrant injunctive relief." *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 647 (6th Cir.1982) (citing *Walker–Davis Publications, Inc. v. Penton/IPC, Inc.*, 509 F.Supp. 430, 435 (E.D.Pa.1981)). However, "[o]nce a challenged claim has been found 'actually false, relief can be granted on the court's own.findings without reference to the reaction of the buyer or consumer of the product." ' *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. at 214 (quoting *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 272 (2d Cir.1987)). *See also McNeilab, Inc. v. American Home Prods. Corp.*, 501 F.Supp. 517, 543 (S.D.N.Y. 1980) ("it is immaterial what consumers find the message of the advertisement to be, and proof of consumer perception is therefore unnecessary").[26]

It is clear to this Court, in light of the findings of fact set forth above, that Telxon has a strong likelihood of success on the merits of its Lanham Act claims against Symbol. As a result this element of the analysis weighs heavily in favor of granting a preliminary injunction.

### 2. Irreparable Injury

The Second Circuit has noted that once the falsity of statements has been established, irreparable harm should be presumed:

A misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer. . . . In that context, we recently confirmed that irreparable harm will be presumed.

*McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.1988).

Because Symbol's representations about its product are either false or misleading, irreparable harm to Telxon may be presumed. Therefore, this factor weighs in favor of granting a preliminary injunction.

### 3. Injury to Others and the Public Interest

It is clear to this Court that the public should be protected from false and misleading statements. Requiring Symbol to stop making such statements will do no harm to Symbol. On the other hand the public will benefit from the issuance of a preliminary injunction.

### IV. CONCLUSION

Having weighed the relevant factors in light of the record evidence, the Court concludes that Telxon is entitled to a preliminary injunction. Accordingly, Telxon's motion for preliminary injunction, as amended (Docket Nos. 3 and 4) is granted.

### V. PRELIMINARY INJUNCTION

For the reasons set forth above, the Court will publish a separate judgment entry GRANTING the plaintiff a preliminary injunction enjoining the defendant Symbol Technologies, Inc. as follows:

A. from making statements (expressly or in substance) that Spectrum 24 is compliant, meets, conforms or is compatible with the IEEE 802.11 standard or draft standard.

---

**26.** The Ninth Circuit has recognized:

It is not easy to establish actual consumer deception through direct evidence. The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived. He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he succeeded.

*U–Haul Internat'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041(9th Cir.1986).

B. from making statements (expressly or in substance) that Spectrum 24 is an open system.

C. from making statements (expressly or in substance) that: (1) IEEE 802.11 is a standard for interoperability; (2) compliance with the IEEE 802.11 will result in interoperability; (3) Spectrum 24 is interoperable; and (4) IEEE 802.11 will provide interoperability between access points.

The Court's Order will further provide:

D. With respect to Paragraphs A and B above, the injunction shall expire as follows: (1) upon finalization of the IEEE 802.11 standard, and (2) written certification that Spectrum 24 is compliant to the final standard by an independent testing agency approved by IEEE 802.11 for testing compliance to the standard.

E. With respect to Paragraph C(l), C(2) and C(3) above, the injunction shall expire as follows: (1) upon satisfaction of Paragraph D above, and (2) additional written certification by an independent testing agency approved by IEEE 802.11 verifying that Spectrum 24 is airwave interoperable with other vendors' products.

F. With respect to Paragraph C(4) above, the injunction shall expire as follows: (1) upon completion of the drafting and finalization of a standard for inter-access point communication, (2) written certification that Spectrum 24 is compliant to the final standard for inter-access point communication by an independent testing agency approved for testing compliance to the standard, and (3) additional written certification by an independent testing agency approved for verifying that Spectrum 24 is access point interoperable with other vendors' products.

As an additional component of injunctive relief, the Court will order the defendant to issue a public retraction stating as follows:

1. That an injunction has been issued against Symbol for false and misleading advertising in the case styled *Telxon Corporation v. Symbol Technologies. Inc.,* U.S. District Court for the Northern District of Ohio, Eastern Division, Case No. 5:96 CV 1911.

2. Symbol has made false and misleading statements that Spectrum 24 (Symbol's frequency hopping network) is compliant with the IEEE 802.11 standard. The truth is that the IEEE 802.11 standard has not been finalized. Spectrum 24 is *not* compliant with the IEEE 802.11 draft standard.

3. Symbol has made false and misleading statements that Spectrum 24 is an open system. The truth is that Spectrum 24 is not an open system. Spectrum 24 is proprietary in its airwave communication. This means that if a customer purchases a Spectrum 24 network, the customer cannot use on that network mobile units containing radios that are manufactured by other vendors.

4. Symbol has made false and misleading statements that Spectrum 24 is interoperable. Interoperability is the ability of a customer to substitute one vendor's product with the product of another. The truth is that Spectrum 24 is not interoperable. In addition, once the standard is finalized, compliance with the standard will not result in interoperability. Vendors that are compliant with the standard will need to work together to achieve interoperability. If this is achieved, then there will be airwave interoperability. That is, a customer will be able to use on its network mobile units containing radios manufactured by multiple vendors. IEEE 802.11 does not contain specifications for communications between access points. As a result, finalization of the standard will not result in interoperability between access points.

The retraction shall be issued as follows: (1) by January 6, 1997, Symbol shall issue a press release containing the retraction; (2) by January 6, 1997, Symbol shall conduct a conference call inviting the same participants that were present at Symbol's conference call of June 25, 1996 and read the retraction; and (3) in the first available edition, Symbol shall publish the retraction in a full one page advertisement in each magazine where it published its advertisement (Exhibit I), including: WIRELESS FOR THE CORPO-

RATE USER; AUTO ID NEWS U.S.; AUTO ID NEWS LATIN AMERICA; AUTO ID NEWS EUROPE; CHAIN STORE AGE EXEC; DATAMATION; LAN MAGAZINE; and INTEROPERABILITY.

Symbol shall promptly file documents with the Court by January 8, 1997, showing compliance with this Order.

IT IS SO ORDERED.

APPENDIX 1

*JUDGMENT ENTRY*

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED the plaintiff is granted a preliminary injunction against the defendant Symbol Technologies, Inc. whereby the defendant is enjoined as follows:

A. from making statements (expressly or in substance) that Spectrum 24 is compliant, meets, conforms or is compatible with the IEEE 802.11 standard or draft standard.

B. from making statements (expressly or in substance) that Spectrum 24 is an open system.

C. from making statements (expressly or in substance) that: (1) IEEE 802.11 is a standard for interoperability; (2) compliance with the IEEE 802.11 will result in interoperability; (3) Spectrum 24 is interoperable; and (4) IEEE 802.11 will provide interoperability between access points.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that:

D. With respect to Paragraphs A and B above, the injunction shall expire as follows: (1) upon finalization of the IEEE 802.11 standard, and (2) written certification that Spectrum 24 is compliant to the final standard by an independent testing agency approved by IEEE 802.11 for testing compliance to the standard.

E. With respect to Paragraph C(1), C(2) and C(3) above, the injunction shall expire as follows: (1) upon satisfaction of Paragraph D above, and (2) additional written certification by an independent testing agency approved by IEEE 802.11 verifying that Spectrum 24 is airwave interoperable with other vendors' products.

F. With respect to Paragraph C(4) above, the injunction shall expire as follows: (1) upon completion of the drafting and finalization of a standard for inter-access point communication, (2) written certification that Spectrum 24 is compliant to the final standard for inter-access point communication by an independent testing agency approved for testing compliance to the standard, and (3) additional written certification by an independent testing agency approved for verifying that Spectrum 24 is access point interoperable with other vendors' products.

IT IS FURTHER ORDERED, ADJUDGED and DECREED as an additional component of injunctive relief, that the defendant issue a public retraction stating as follows:

1. That an injunction has been issued against Symbol for false and misleading advertising in the case styled *Telxon Corporation v. Symbol Technologies. Inc.,* U.S. District Court for the Northern District of Ohio, Eastern Division, Case No. 5:96 CV 1911.

2. Symbol has made false and misleading statements that Spectrum 24 (Symbol's frequency hopping network) is compliant with the IEEE 802.11 standard. The truth is that the IEEE 802.11 standard has not been finalized. Spectrum 24 is *not* compliant with the IEEE 802.11 draft standard.

3. Symbol has made false and misleading statements that Spectrum 24 is an open system. The truth is that Spectrum 24 is not an open system. Spectrum 24 is proprietary in its airwave communication. This means that if a customer purchases a Spectrum 24 network, the customer cannot use on that network mobile units containing radios that are manufactured by other vendors.

4. Symbol has made false and misleading statements that Spectrum 24 is interoperable. Interoperability is the ability of a customer to substitute one vendor's product with the product of another. The truth is that Spectrum 24 is not interoperable. In addition, once the standard is finalized, compliance with the standard will not result in interoperability. Vendors that are compliant with the standard will need to work together to achieve interoperability. If this is achieved, then there will be airwave interoperability. That is, a customer will be able to use on its network mobile units containing radios manufactured by multiple vendors. IEEE 802.11

does not contain specifications for communications between access points. As a result, finalization of the standard will not result in interoperability between access points.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the retraction shall be issued as follows: (1) by January 6, 1997, Symbol shall issue a press release containing the retraction; (2) by January 6, 1997, Symbol shall conduct a conference call inviting the same participants that were present at Symbol's conference call of June 25, 1996 and read the retraction; and (3) in the first available edition, Symbol shall publish the retraction in a full one page advertisement in each magazine where it published its advertisement (Exhibit I), including: WIRELESS FOR THE CORPORATE USER; AUTO ID NEWS U.S.; AUTO ID NEWS LATIN AMERICA; AUTO ID NEWS EUROPE; CHAIN STORE AGE EXEC; DATAMATION; LAN MAGAZINE; and INTEROPERABILITY.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Symbol shall promptly file documents with the Court by January 8, 1997, showing compliance with this Judgment Entry.