**ABBOT LABORATORIES, Plaintiff,**

v.

**GERBER PRODUCTS COMPANY, INC. and Novartis Nutrition Corporation, Defendants.**

No. 1:97–CV–338.

United States District Court,
W.D. Michigan,
Southern Division.

Sept. 24, 1997.

**570**

Jon G. March, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, Thomas C. Morrison, Patterson, Belknap, Webb & Tyler, LLP, New York City, for plaintiff.

Robert D. Vanderlaan, Schenk, Boncher & Prasher, Grand Rapids, MI, for defendants.

### OPINION

QUIST, District Judge.

Plaintiff, Abbott Laboratories ("Abbott"), brings this action against Defendants, Gerber Products Company, Inc. ("Gerber") and Novartis Nutrition Corporation ("Novartis"), alleging false advertising under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Now before this Court is Abbott's motion for preliminary injunction.

### Facts

Abbott, an Illinois corporation, manufactures health care products including nutritional supplement beverages, pediatric products, prescription pharmaceuticals, and medical devices. Ross, a division of Abbott, makes and sells Ensure, a nutritional supplement beverage on the market.

Novartis, a Minnesota corporation, is a wholly-owned subsidiary of Novartis Corporation. Gerber, a Michigan corporation, is also a wholly-owned subsidiary of Novartis Corporation. Novartis manufactures and distributes various food and over-the-counter health care products, including Resource, a nutritional supplement beverage. Gerber primarily manufactures baby food products but also markets Resource for Novartis.

Nutritional supplement beverages ("NSBs") were developed as meal replacement products for elderly people or people with medical conditions who needed an easily digestible food source to supplement their regular diet. Initially, NSBs were available primarily through hospitals or nursing homes. In recent years, NSBs have been distributed directly to consumers through supermarkets, pharmacies, and other retail outlets.

Ensure has consistently held the greatest market share of all NSBs on the market. Novartis and Gerber (hereinafter collectively referred to as "Gerber") reformulated Resource and, in 1997, launched an advertising campaign and began distributing the newly reformulated Resource in select United States markets. The advertising campaign asserts, among other things, that "America Prefers Resource Over Ensure" and "National Preference Winner Resource Beats Ensure." Abbott subsequently filed suit in this Court alleging that Gerber's advertising claims are false because the studies they are based upon do not support Gerber's claims.

### Discussion

**1. Preliminary Injunction Standard**

■ Abbott requests preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65(a). A district court should address the following factors in determining whether to issue a preliminary injunction: 1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim, 2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief, 3) the probability that granting the injunction will cause substantial harm to others, and 4) whether the public interest is advanced by the issuance of the injunction. *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1480 (6th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1421, 134 L.Ed.2d 545 (1996) (citing *Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir. 1994)). These inquiries are factors "to be balanced, not prerequisites that must be met." *Id.* (quoting *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985)). Furthermore, "the degree of likelihood of success required may depend on the strength of the other factors." *Id.* A district court is given broad discretion in determining whether or not to grant a preliminary injunction. *Id.*

### 2. Likelihood of Success on the Merits

■ Abbott brings this action pursuant to Section 43(a)(1)(B) of the Lanham Act which states in part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). In order to establish a prima facie case for false and misleading advertising under the Lanham Act, a plaintiff must show:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997) (citations omitted) (footnote omitted). *See also ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C.Cir.1990) (discussing similar burden of proof on a plaintiff's false and misleading advertising claim); *Brown v. Armstrong,* 957 F.Supp. 1293, 1301–02 (D.Mass.1997) (applying similar three-part test); *Telxon Corp. v. Symbol Techs., Inc.,* 961 F.Supp. 1113, 1122–23 (N.D.Ohio 1996) (noting same elements that must be established by a plaintiff); Thomas McCarthy, McCarthy on Trademarks and Unfair Com-

petition § 27:24 (4th ed.1996) (setting forth and discussing similar criteria).

■ The pivotal element in the instant case is whether Gerber's advertising campaign contained false statements of fact. In order to prove falsity, a plaintiff must show either that "the advertising is literally false as a factual matter, or ... although the advertisement is literally true, it is likely to deceive or confuse customers." *National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997) (quotations and citation omitted). If a plaintiff can show that a statement is literally false, then a court may grant relief regardless of the reaction of buyers or consumers of the product. *Avila v. Rubin,* 84 F.3d 222, 227 (7th Cir.1996) (citation omitted). If, however, a statement is not literally false, a court may find the statement to be misleading only if evidence of actual consumer confusion is presented. *Id.; L & F Prods. v. Procter & Gamble Co.,* 45 F.3d 709, 711 (2d Cir.1995) (finding that a plaintiff's theory of implied falsity must be accompanied by extrinsic evidence showing advertisement is likely to mislead or confuse).

■ In the case at issue, Abbott argues that Gerber's claim that Resource is preferred over Ensure is literally false, and, therefore, Abbott need not show consumer confusion. This Court agrees that if Abbott can establish that Gerber's claim is literally false, that evidence of consumer confusion is not needed.

Abbott asserts that Gerber's claim is false in two ways: 1) the tests Gerber relies upon to support its claim were conducted as taste tests and not as tests indicating overall preference, and 2) these tests do not show that Resource tastes better or is preferred over Ensure.

This Court finds that Gerber's preference claim is, in reality, a taste claim. Abbott's own experts use the term "preference" when describing how consumers feel about the taste of *NSBs.* For example, Robert Crim, the group marketing manager of Ensure at Ross Laboratories, stated:

It's pretty well documented in the literature that a sweet product in a short-term

test might be preferred to a not-sweet product. But if you're drinking one and a half, two, three, four cans a day or servings a day, whatever it might be, the sweeter product would not be preferred because it can be too much of that. So, absolutely, your preferences can change.

(Crim Tr., p. 44.)

Also, the following discourse took place with Joseph Messing, president of Marketing Insights and Technologies, at his deposition:

> Mr. Stein: So a paired taste test in a central location on a blind basis is an appropriate fashion of substantiating a preference claim.
>
> Mr. Messing: I believe it is the preferred form.

(Messing Tr., p. 82 (citing Messing Dep., p. 68).) In fact, Messing stated that "[i]n food and beverage products, there is such a high correlation [between asking a consumer which product he preferred overall and which product he preferred for its overall taste] that asking one is tantamount to asking the other." (Messing Tr., p. 89.)

One of Gerber's experts, David Yates, general manager of new business at Gerber, agreed with Messing on this point:

> It really is the question that's asked of the consumer—which do you prefer versus which tastes better. From a marketer's standpoint, I think it was Mr. Messing that said yesterday in his mind, for a food product, preference is tantamount to taste. And these are food products. The nutritional profiles are very similar. This gets down to a very specific test that was done for advertising.

(Yates Tr., p. 87.)

Furthermore, Michael Mazis, a professor of marketing at American University, made several similar statements:

> It's labeled NBC/Beverage Preference Claims, Research and Documentation Guidelines. So it primarily deals with taste tests. It says here: "In view of the methodology and analytical approaches that can be taken in an attempt to quantify taste equivalence or superiority among products, the following guidelines are suggested," et cetera, et cetera. So it's preference tests, but primarily taste preference tests that this particular section applies to.

> \* \* \* \* \* \*

> And I like healthy soup, because it's not salty, and it doesn't have a lot of fat in it. So my preferences on soup are going to be quite a bit different than somebody who eats Campbell's Cream of Mushroom Soup something that has a lot of cream in it and so on.

> \* \* \* \* \* \*

> Now, just about everybody—not all people, but a huge percentage of people actually drink soda. [This example of a NAD case] says: "It, referring to Jake's Diet Cola," which is actually a Pepsi–Cola brand, "tastes better than Diet Coke." I mean, this is an unqualified claim. It's the same as saying, "America prefers Jake's Diet Cola over Diet Coke."

> \* \* \* \* \* \*

> Well, basically we look at all these claims, and that's basically what they're saying. They're saying "America prefers or in a national taste test" or whatever.

> \* \* \* \* \* \*

> Obviously, when you taste two products and you say, "Which do you prefer," the obvious implication is, well, which one tastes better.

(Mazis Tr., pp. 129, 134–136, 179.) Mazis, however, did testify that there is "absolutely" a difference between a taste claim and a preference claim if there are relevant attributes other than taste. (Mazis Tr., p. 179.) Mazis also testified that a preference claim is broad and could include nutrition along with taste. (Mazis Tr., p. 178.) What it turned on was how important and how central taste was to overall preference. (Mazis Tr., p. 200.)

In its complaint, Abbott alleges:

> [f]or the most part, the nutritional supplement beverages on the market are thick, opaque, shake-like products made from water, sugar, corn syrup and protein and are fortified with vitamins and minerals. Most formulations are high in carbohy-

drates, protein, and fat, although some formulations are marketed as "light" versions and contain a reduced amount of fat. (Complaint at 4.)[1] Furthermore, Robert Crim indicated that two-thirds of the volume of NSBs are used by consumers who need NSBs for medical reasons. (Crim Tr., p. 28.)

If NSBs are somewhat similar, as described by Abbott, and if a consumer needs an NSB for medical reasons, which Crim stated that a substantial majority do, and if they must choose between several different NSBs on the market, and if the products from which they can choose are substantially the same nutritionally, then it appears that the consumer would pick the one that tastes best.[2] Based upon the record in this case, Gerber's preference claim is analogous to a taste claim. Therefore, this Court will treat it as such.

Abbott contends that the tests Gerber relies upon and the tests relied upon by Abbott do not support Gerber's taste claim. In order to show that a defendant's claim that "tests prove" defendant's product is superior over plaintiff's product is false, "plaintiff must prove only 'that the tests [relied upon] were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited.'" *Rhone–Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.,* 93 F.3d 511, 514 (8th Cir.1996) (citing *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62–63 (2d Cir.1992) and also citing, among others, *BASF Corp. v. Old World Trading*

*Co.,* 41 F.3d 1081, 1089–91 (7th Cir.1994); *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1138 (4th Cir.1993)). In upholding the district court's finding that no false advertising occurred, the court in *Rhone–Poulenc* further stated:

> We note that Lanham Act liability for 'tests prove' advertising requires proof that the tests are not 'sufficiently reliable' to support the advertised conclusion with 'reasonable certainty.' To ensure vigorous competition and to protect legitimate commercial speech, courts applying this standard should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion.

*Rhone–Poulenc,* 93 F.3d at 515.

Gerber commissioned U.S. Research Company ("U.S.Research"), an independent market research firm, to perform a nationwide "product preference test" on its newly reformulated Resource as compared to Ensure. Approximately 4,000 people in total participated in the tests with approximately 400 people testing each separate category. The test results indicated a preference for Resource over Ensure in every category tested.[3]

Abbott's primary objection to Gerber's reliance on the U.S. Research test is that U.S. Research did not restrict its test participants to only those consumers who actually use NSBs. Rather, U.S. Research limited its test

---

1. Yates testified that NSBs have similar nutritional profiles. (Yates Tr., at p. 87.)

2. If an advertiser was claiming that its chocolate malt was "preferred" over Ensure, then a preference claim of this type would not be the equivalent of a taste claim since, most likely, a consumer would always prefer the taste of a chocolate malt over a nutritional supplement beverage.

The determining factor would be how important taste was to overall preference. If a consumer wants a nutritional supplement beverage, then nutrition would be the central factor to overall preference. However, when the comparison is between two nutritional supplement beverages which are very similar in nutritional value, the central factor that is left is taste.

3. The categories included regular Resource and Ensure in vanilla, chocolate, and strawberry, and Resource Plus and Ensure Plus in vanilla, chocolate, and strawberry.

When asked which product tastes better consumers responded as follows:

| | | | |
|---|---|---|---|
| Vanilla Regular: | Resource 58.4% | Ensure 39.0% | No Preference 2.5% |
| Chocolate Regular: | Resource 65.5% | Ensure 30.2 % | No Preference 4.3% |
| Strawberry Regular: | Resource 60.5 | Ensure 35.5% | No Preference 4.0% |
| Vanilla Plus: | Resource 53.5% | Ensure 42.5% | No Preference 4.0% |
| Chocolate Plus: | Resource 66.5% | Ensure 27.0% | No Preference 6.5% |
| Strawberry Plus: | Resource 64% | Ensure 29.2% | No Preference 6.8% |

participants to those over the age of fifty-five, whether or not they use NSBs.

In support of its argument, Abbott refers this Court to television network guidelines, market research texts and guides, and decisions of the National Advertising Division ("NAD") of the Better Business· Bureau. Abbott interprets these references as requiring that all test participants must actually use the products being tested. Many of these references, however, can be interpreted as allowing test participants to be potential users of the products being tested. For example, the NBC Network Guidelines state in part:

> Unless the claim is geared towards a specific population, the sample should be representative of all relevant product users, e.g., teens and those over 60, men and women.

(Plaintiff's Appendix at Ex. B.) This guideline does not state "e.g., only those who actually use the product." Some other examples are from a NAD workshop:

> Only those who *typically* eat the product ... should be included in the study .... and be conducted among people who *normally* use [the product].... The first step in conducting a survey is to *define* the universe of consumers who actually purchase or use the products.... The universe should include all relevant respondents and exclude inappropriate, unknowledgeable, or *unconcerned* respondents.

(Plaintiff's Appendix at Exs. C, D, and E (emphasis added).)

Abbott also cites several cases discussing the appropriate "universe" advertisers should use when conducting consumer reaction surveys. Assuming that the tests conducted by U.S. Research were consumer reaction surveys, courts approve of the use of actual and potential users in consumer reaction surveys. *See, e.g., Brooks Shoe Manuf. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 861 (11th Cir.1983); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir.1980); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1549 (S.D.Tex.1996). Furthermore, this Court is not aware of any case discussing how to determine an appropriate universe of test participants in consumer preference tests.

This Court recognizes that Abbott's argument is not without some support;[4] NSBs, however, are an unusual product. As Robert Crim stated:

> It's unfortunate in this category that we actually have a leaky bucket and we lose users every year because of death or because of—their medical condition has gone away. If they were recovering from surgery and they recovered, some of those people leave the category. So we need to be bringing new folks into the category on a regular basis just to kind of tread water.

(Crim Tr., pp. 42–43.) Joseph Messing testified that Abbott, in its studies, considered including both current and potential users of NSBs. (Messing Tr., p. 78.) Messing, however, discouraged Abbott from doing so based upon efficiency and cost. (Messing Tr., pp. 78–79.) Gerber's marketing strategy also

---

**4.** Abbott argues that NSB users have an experienced palette and that unless experienced NSB users are used exclusively as test participants then the entire test is useless. Abbott cited several NAD decisions regarding taste tests. In *The Minute Maid Co.*, the NAD did acknowledge that actual users of the product should be test participants; however, since the challenger· did not "show support for a conclusion that a substantial number of consumers would reasonably infer that the test results included the opinions of people who did not drink any store-bought juice, it [sic] absence also did not render the advertising claim inaccurate." (Plaintiff's Appendix at Ex. H.) In *Van Den Bergh Foods Co.*, "[t]he NAD reasoned that though female heads of household may be the most likely to purchase a food item like pasta sauce, they are not exclusively *likely* to

taste it or express a taste preference for it." (Plaintiff's Appendix at Ex. I (emphasis added).) In *Pet Inc.*, the NAD, recognizing that "the proper universe be identified and examined, still rejected the challenger's experts' opinions that the test was so methodologically flawed that it should not be given any weight." (Plaintiff's Appendix at Ex. K.) In *Pepsi–Cola USA*, the NAD stated that "the research [which included users and nonusers of diet sodas] would support a qualified preference claim with disclosure of the fact that taste tests were conducted among regular and diet cola users." This Court notes that these NAD decisions were analyzed on a case-by-case basis, looking at the specific advertisement, product, and tests conducted. These decisions do not contain hard and fast rules regarding choice of test participants in taste tests.

was to reach new entrants into the market, specifically males and females over the age of fifty-five who would be heavy users. (Tr., Day Two, p. 7.)

This Court finds Gerber's use of test participants over the age of fifty-five, whether users or potential users, was appropriate. NSBs are in a dynamic market. Consumers are entering and leaving the market at a very high rate. Furthermore, consumers are in the market for a very short period of time, making it necessary for companies who market NSBs to reach potential users. If Gerber wanted to limit the test participants to users and potential users, the only way to limit the participants would be to have a requirement that test participants be over the age of fifty-five since a majority of the users of NSBs are over the age of fifty-five. (*See* Complaint at 4.) Gerber limited its test participants to those most likely to have used or will use NSBs in the relatively near future. Furthermore, Gerber qualified its claim so that consumers would know that the

test was limited to test participants over the age of fifty-five.[5]

"[A] Lanham Act plaintiff bears the burden of showing that a challenged advertisement is false or misleading, not merely that it is unsubstantiated by acceptable tests or other proof." *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 227–28 (3d Cir.1990) (quoting *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.,* 747 F.2d 114, 119 (2nd Cir.1984)). *See also American Home Prods. Corp. v. Procter & Gamble Co.,* 871 F.Supp. 739, 758 (D.N.J. 1994) (noting that a plaintiff must prove that the claim in question is false or misleading, not merely unsubstantiated). Abbott has shown not shown that Gerber's claim is literally false,[6] nor does this Court have any evidence before it indicating that consumers are misled by Gerber's advertisements.[7] Therefore, Abbott has failed to show that the U.S. Research test that Gerber relied upon was not sufficiently reliable to support Gerber's claim with reasonable certainty.[8]

5. Although Abbott argues that Gerber's claim is literally false, Abbott's argument could appear to be that Gerber's claim is implicitly false, i.e., consumers interpret Gerber's statement "among people fifty-five and older" as meaning "among people fifty-five and older who are using nutritional supplement beverages;" or, i.e., consumers believe that Resource is preferred because it is nutritionally superior to Ensure. In these instances, the Court would have to determine how consumers interpret Gerber's advertisements. Abbott, however, has provided no evidence of consumers' reactions to the advertisements, leaving the Court to interpret the advertisements on its own, which is an unacceptable replacement for proof of consumers' reactions. *See, e.g., L & F Prods.,* 45 F.3d at 711 (noting that where the challenged advertisement is impliedly false, extrinsic evidence must confirm that the advertisement is likely to mislead or confuse); *Avila,* 84 F.3d at 227 (noting that the court may find that a statement that is not literally false is impliedly misleading only if presented with evidence of actual consumer deception); *S.C. Johnson & Son, Inc. v. Clorox Co.,* 930 F.Supp. 753, 779 (E.D.N.Y.1996) (holding that consumer survey evidence is required to prove that a claim that is literally true is misleading or confusing). *See also,* pp. 571–73 of this Opinion.

6. Abbott further argues that the U.S. Research test was flawed because Ensure was obtained off-the-shelf and Resource was obtained directly from the factory. Michael Mazis stated that since Resource was a new product that this was

an acceptable method but that another test should be conducted as soon as reasonably possible after the new product is on the market comparing both products from off-the-shelf. Abbott also asserts that the questions posed in the U.S. Research test were not explicit enough about the option to choose "no preference," and that there are more preferred ways of asking this question. These arguments, however, at best, could cast some doubt on the U.S. Research test, but certainly not enough to declare it unreliable and without merit.

7. *See supra* note 5.

8. Abbott also submitted to this Court tests of its own, the most significant of which was conducted by Marketing Insights, a market research firm. The tests by Marketing Insights were conducted in fifteen to twenty cities across the country and compared the chocolate, vanilla, and strawberry flavors of Ensure to Resource. Approximately 600 people participated in each test. Abbott admits that the first study mistakenly included an old formulation of Resource; therefore, a second study was done. In the second study, the results show that out of 629 respondents 48.8% preferred Resource, 41% preferred Ensure, and 10.2% had no preference. (Messing Decl., Ex. B.) The preference of the flavors were also broken down with Resource being the preference in all categories. (*Id.*) Abbott argues that the preference is very small, and, therefore, not statistically significant. The fact that the test performed by Marketing Insights shows a less

### 3. Irreparable Injury; Harm to Others; the Public Interest

In cases where false comparative advertising is shown, irreparable injury is presumed. *See, e.g., McNeilab, Inc. v. American Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.1988). Abbott, however, has failed to show that Gerber's claim is false or offer proof of irreparable injury. Furthermore, the costs to Gerber would be substantial if Gerber were required to cease its current advertising campaign or to recall or relabel Resource. In any event, the parties agree that the public interest is best served by truthful advertising and greater competition. *See Coca–Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 31 (6th Cir.1987) (discussing public policy in relation to the Lanham Act).

Balancing these factors, including this Court's determination that Abbott has not shown that it is likely to succeed on the merits of the case, this Court will deny the preliminary injunction.

### *Conclusion*

For the foregoing reasons, Abbott's motion for preliminary injunction will be denied.

statistically significant preference for Resource does not establish that the test performed by U.S. Research was unreliable. Moreover, as Gerber points out, there were other factors that could account for the differences in results. For example, the test specifically identified the products to be tested. Furthermore, Gerber points out that since Ensure has the greatest market share of any NSB and by excluding potential users from the test, there is a possibility that test participants at times chose the brand most familiar to them.