**PLAYBOY ENTERPRISES, INC., Plaintiff,**

v.

**RUSS HARDENBURGH, INC., Defendant.**

No. 1:93 CV 0546.

United States District Court, N.D. Ohio, Eastern Division.

Nov. 25, 1997.

Daniel F. Gourash, Porter, Wright, Morris & Arthur, Cleveland, OH, David P. Peterson, Douglas Hancock, John D. Vandenberg, Klarquist, Sparkman, Campbell, Leigh & Whinston, Portland, OR, for Plaintiff.

Thomas Schick, Thomas P. O'Donnell, McNeal, Schick, Archibald & Biro, Cleveland, OH, for Defendants.

### Order

SAM H. BELL, District Judge.

This case raises the question of a computer bulletin board system operator's liability for copyright and trademark infringement regarding information available to its customers through their home computers. Plaintiff Playboy Enterprises, Inc. ("PEI") asks the court to find that Defendants Rusty–N–Edie's, Inc. ("RNB") and Russ Hardenburgh are liable for direct and/or contributory copyright infringement with respect to 412 graphic image files ("GIFs") which were allegedly available to paying customers of Defendants' bulletin board service (the "BBS"). These files, asserts PEI, contain illegal copies of adult photographs from PEI's Playboy Magazine. PEI also claims that Defendants' violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by removing the name or trademark of PEI and distributing the photographs under other names for a profit. Defendants answer that there are genuine issues of material fact with respect to each of Plaintiff's claims, precluding summary judgment.

The court has considered the evidence and arguments of the parties, and is now prepared to offer its decision in this matter.

Plaintiff's motion for summary judgment is granted with respect to its claims of direct and contributory copyright infringement against both RNE and Mr. Hardenburgh. Plaintiff's motion is denied with respect to its Lanham Act claim, which claim shall be set forth for trial.

The court's reasoning in this matter is set forth below.

### Background

A computer bulletin board service ("BBS") offers home computer owners a method for obtaining information from a central source by use of a modem.[1] Remote computers access the central service through telephone lines. Files of information are stored in the central system, and subscribers may either "download" information into their home units, or "upload" information from their home units into the central files. The owner of the service controls the terms by which remote computer owners will be able to access the system, and typically will control the conditions under which information may be downloaded or uploaded.

BBS owners often provide other services to subscribers, including electronic mail capabilities, "chat rooms" where many subscribers may communicate at once, and Internet access to the World Wide Web. Local bulletin board services such as the one in this case might be distinguished from massive on-line services such as America On–Line or Compuserve, which provide similar services to customers on a much larger scale.

Defendant RNE and its President, Russ Hardenburgh, began operating a local BBS out of Boardman, Ohio in the early days (relatively speaking) of this technology. In July of 1988, "Rusty–N–Edie's BBS" became available to owners of home computers. (2nd Hardenburgh Aff. ¶ 1.) For a fee, subscribers received access to certain files which were otherwise off limits to the general public, and had the right to download a set number of megabytes of electronic information from these files every week. (Hardenburgh dep. pp. 120–122.) The BBS also provided e-mail services, chat lines, advertisements for goods, computer technical assistance, and a "matchmaker" dating service. (2nd Hardenburgh Aff. ¶ 3.)

By January of 1993, the central BBS had grown to 124 computers, with nearly 6000 subscribers. (2nd Hardenburgh Aff. ¶ 6.) Approximately 105,000 to 110,000 files were

---

1. For background information in this area, the court consulted a number of articles on the subject of computer bulletin boards and copyright infringement. *See* Keith Stephens & John P. Summer, *Catch 22: Internet Service Providers' Liability for Copyright Infringement over the Internet,* 14 No. 5 Computer Law I (1997); John Gladstone Mills III *Entertainment on the Internet: First Amendment and Copyright Issues,* 79 J. Pat. & Trademark Off. Soc'y 46 I ( 1997); Joseph V. Myers, Note, *Speaking Frankly About Copyright Infringement on Computer Bulletin Boards: Lessons to be Learned from Frank Music, Netcom, and the White Paper,* 49 Vand. L.Rev. 439 (1996); Scott K. Pomeroy, Comment, *Promoting the Progress of Science and the Useful Arts in the Digital Domain; Copyright, Computer Bulletin Boards, and Liability for Infringement by Others,* 45 Emory L.J. 1035 (1996).

available for downloading, nearly half of which were graphic image files, or "GIFs." (*Id.*) A GIF is created by scanning a photograph to create digital data that can be run through a computer. GIFs from Rusty–N– Edie's BBS could be downloaded by the customer to his or her home computer, and could be viewed only with the assistance of certain specialized software. (*Id.*) Approximately 40,000 of the GIFs available to subscribers at this time, Defendants admit, contained "adult" photographs. (1st Hardenburgh Aff. ¶ 6.)

To increase its stockpile of available information, and thereby its attractiveness to new customers, Defendants provided an incentive to encourage subscribers to upload information onto the BBS. Subscribers were given a "credit" for each megabyte of electronic data that they uploaded onto the system. For each credit, the subscriber was entitled to download 1.5 extra megabytes of electronic information, in addition to the megabytes available under the normal terms of subscription. (Hardenburgh dep. p. 157.) According to Defendants, information uploaded onto the BBS went directly to an "upload file" where an RNE employee briefly checked the new files to ascertain whether they were "acceptable," meaning, not pornographic, and not blatantly protected by copyright. (Hardenburgh dep. p. 138–142.)

PEI is understandably concerned that on-line systems can be used to transmit copies of its copyrighted photographs to people who have not themselves purchased Playboy Magazine. In the early 1990s, PEI employee Anne Steinfeldt was given the job of scanning on-line systems to determine whether such photographs were available to subscribers via their home computers. (2nd Steinfeldt Aff. ¶ 1.) In November of 1992, Ms. Steinfeldt subscribed to Rusty–N–Edie's BBS under the pseudonym "Bob Campbell." (*Id.* at ¶ 2.) She conducted key word searches in the files available on the BBS, and claims to have downloaded approximately 100 GIFs from the BBS which contained reproductions of PEI's photographs. (*Id.* at ¶ 5.) She transferred these files to floppy disks, and then delivered the disks to PEI photo-librarian Timothy Hawkins. (Hawkins Aff. ¶¶ 2,3.)

Mr. Hawkins states that he examined the files by displaying the images on his computer monitor and comparing those images with photographs from Playboy Magazine. (*Id.* at ¶¶ 3,4.)

On March 11, 1993, PEI filed its original complaint against RNE and Mr. Hardenburgh in this court, alleging copyright and trademark infringement. (Docket # 1.) The case was assigned to District Judge Battisti. On January 7, 1994, PEI moved for summary judgment on its claims of copyright infringement with respect to 99 GIFs allegedly downloaded from the BBS by Ms. Steinfeldt and reviewed by Mr. Hawkins. (Docket # 28.) PEI listed the titles of the 99 GIFs at issue in its Exhibit A but only submitted ten actual copies of the allegedly infringing images. (Docket # 29.) PEI paired these ten reproductions of computer screens with ten virtually identical photographs from Playboy Magazine. (*Id.*) PEI also produced the certificates of copyright for each of the PEI photographs listed in its Exhibit A. (*Id.*) Based upon these submissions and the accompanying affidavits of its employees, PEI argued that Defendants could raise no genuine issue of material fact to dispute the assertion that all 99 GIFs had appeared on the BBS. (*Id.*) Defendants, PEI argued, were jointly and severally liable for copyright infringement as a matter of law.

On January 31, 1994, PEI moved for summary judgment on its Lanham Act unfair competition claim. (Docket # 33.) PEI argued that Defendants had falsely implied that they were the source of PEI's images by adding text to PEI photographs that was not present originally, and by deleting text that *was* originally present. (*Id.*) PEI claimed that the words "Rusty–N–Edies" had been added to some of the photographs, along with the telephone number for one of Defendants' BBS phone lines. (Docket # 34.) PEI provided one actual example of this activity. (*Id.*)

Defendants responded to PEI's motions for summary judgment on February 24, 1994, arguing that there were genuine issues of material fact with respect to each of PEI's claims. (Docket # 40.) Defendants argued that PEI's submissions did not prove that the

99 GIFs listed in Exhibit A were actually present on the BBS. (*Id.*) Mr. Hardenburgh claimed that he had reviewed the floppy disks in question, and had found them to contain 85 GIFs, not 99. Only 82 of the files on the disks, he asserts, were even listed in Plaintiff's Exhibit A, four of which were created or modified after Ms. Steinfeldt turned the disks over to Mr. Hawkins. (1st Hardenburgh Aff. ¶ 5.) Defendants argued that these inconsistencies cast doubt on the credibility of PEI employees Steinfeldt and Hawkins, and precluded summary judgment in PEI's favor. (Docket # 40.)

PEI replied to Defendants on June 10, 1994, and in doing so brought new evidence to light. (Docket # 46.) PEI explained to the court that on January 30, 1993 the Federal Bureau of Investigation had conducted an unrelated search of the Hardenburgh premises pursuant to a search warrant, and had seized Defendants' BBS equipment. (*Id.;* 1st Hardenburgh Aff. ¶ 2.) In connection with this search, the FBI had created computer tapes (the "FBI Tapes") which contained all of the information present on the BBS at that time, including all GIFs available to subscribers for downloading. (1st Tesnakis Aff.) Both sides of the litigation, PEI explained, were in possession of copies of these tapes. (Gibson Aff. ¶¶ 4,5,6.) Having reviewed the tapes, PEI withdrew its motion for summary judgment with respect to 79 of the 99 GIFs originally at issue. PEI was apparently unable to confirm that these 79 GIFs were on the BBS at the time of the FBI search. (Docket # 46.) With respect to the other 20 GIFs, however, PEI asserted that the FBI Tapes conclusively established that these files were present on Defendants' BBS on January 30, 1993, *and* that they directly infringed PEI's copyrights. (*Id.*) PEI submitted copies of these 20 GIFs as extracted from the FBI Tapes, and also submitted the corresponding 20 photographs from Playboy Magazine. (Exhibit 2 to Tesnakis Aff.) PEI noted that it would continue to study the FBI Tapes to determine whether a future motion for summary judgment could be filed with respect to other files present on the BBS which may have infringed PEI's copyrights. (Docket # 46.)

Defendants surreplied to Plaintiff's answer on July 11, 1994. (Docket # 51.) Defendants implied that any PEI photographs which appeared on the BBS were placed there by RNE *subscribers,* not RNE employees. (*Id.*) Because Defendants had not themselves taken part in any infringing activity, they asserted, they could not have directly infringed PEI's copyrights. (*Id.*)

On September 14, 1994, Magistrate Judge Bartunek issued a Report and Recommendation regarding PEI's motions for summary judgment. (Docket # 60.) The Magistrate recommended that the court grant Plaintiff's motion for summary judgment regarding Defendants' liability for direct copyright infringement. (*Id.*) The Magistrate found that there was no dispute that PEI owned the copyrights in question and that the 20 GIFs at issue had, in fact, appeared on Defendants' BBS. (*Id.*) Also, it was abundantly clear to the Magistrate that the GIFs produced by Plaintiff were copies of the 20 PEI photographs submitted into evidence. (*Id.*) As to Defendants' claim that it was BBS *subscribers* who uploaded the information onto the system, the Magistrate felt that this argument was immaterial in relation to a finding of copyright infringement. (*Id.*)

With respect to any Lanham Act violations, alternatively, the Magistrate recommended that the court deny Plaintiff's motion. (*Id.*) The Magistrate felt that in order to prevail on their Lanham Act claim, PEI would have to prove that it was Defendants, and not their subscribers, who engaged in activity which misled consumers about the source of the images. (*Id.*)

Both Plaintiff and Defendant filed objections to the Magistrate's Report and Recommendation. (Docket # s 64, 66, 69.)

On November 1, 1994, following Judge Battisti's death, the case was transferred to Senior Circuit Judge Krupansky. (Docket # 71.) Soon thereafter, on January 17, 1995, PEI filed its third motion for summary judgment. (Docket # 74.) As promised, PEI had scrutinized the FBI Tapes and announced that it was now prepared to prove that 392 additional GIFs containing copies of PEI photographs were present on Defendants' BBS at the time of the FBI search.

(Docket # 75.) PEI produced, for the court's consideration, copies of each and every one of the GIFs at issue, in addition to the corresponding PEI photograph. (Exhibit D to 2nd Tesnakis Aff.) PEI also produced certificates of copyright for each photograph. (Exhibit B to 2nd Tesnakis Aff.) PEI repeated their claim that Defendants were liable for direct copyright infringement, but argued in addition that Defendants were liable for contributory copyright infringement. (Docket # 75.) PEI produced the deposition testimony of three RNE employees, each of whom stated that any GIFs which were uploaded onto the BBS were placed in an upload file, and were not released onto the system for subscribers until they were reviewed by RNE staff. (Hardenburgh dep., Little dep., McFarland dep.) Defendants responded, echoing many of the arguments they had made previously. (Docket # 88.) Defendants also argued that a finding of copyright infringement on the part of a computer bulletin board service would "halt the computer age at its inception" by overburdening BBS owners with the "impossible" task of screening their systems for any and all copyrighted material. (*Id.*) On March 1, 1996 the case was transferred here. (Docket # 104.)

The parties have offered numerous submissions and arguments in addition to those described above, some of which will be touched upon below. The question presented in this litigation, however, has remained fundamentally the same throughout. It is: *has PEI produced sufficient evidence to warrant summary judgment on its claims of copyright and trademark infringement?*

**Standard of Review**

The Court of Appeals for the Sixth Circuit recently summarized the standard of review governing motions for summary judgment under Federal Rule of Civil Procedure 56:

> Summary judgment is appropriate where 'there is no genuine issue of material fact ... and the moving party is entitled to judgment as a matter of law.' .... [The] court must view all facts and inferences drawn therefrom in the light most favorable to the non-moving party.

> The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.

> 'By its very terms, this standard provides that the existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.' The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict in favor of the nonmoving party. If the disputed evidence 'is merely colorable or is not significantly probative, summary judgment may be granted.'

*Leo LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993) (citations omitted). With this standard in mind, the court shall analyze the PEI's motions for summary judgment.

**Law and Analysis**

PEI has moved for summary judgment on three independent claims. Each claim, the court will assume, applies to the 412 GIFs submitted into evidence.

**I.**

*Direct Copyright Infringement*

 To sustain a case of direct copyright infringement, Plaintiff must first satisfy two threshold requirements. Plaintiff must prove "(1) ownership of a valid copyright, and (2) copying [by the defendants] of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.,* 58 F.3d 1093, 1095 (6th Cir.1995); *Wickham v. Knoxville Int'l Energy Exposition, Inc.,* 739 F.2d 1094, 1097 (6th Cir.1984). PEI's certificates of copyright create a presumption of the validity of the copyrights in this case. 17

U.S.C.A. § 410(c). Although the presumption may be rebutted, it is the burden of the party challenging the copyright to do so. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 831 (10th Cir.1993). Defendants have not rebutted the ownership or validity of PEI's copyrights, which the court takes as established.

■ To prove the "copying" element, Plaintiff may either produce direct evidence that Defendants copied their material, or may create an inference that copying occurred by showing: (1) that Defendants had access to the protected work, and (2) that the two works are substantially similar. *Wickham,* 739 F.2d at 1097; *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 (2d Cir.1977). Plaintiffs have no difficulty establishing the "copying" element. First, Defendants clearly had access to Playboy Magazine and the photographs contained therein at the time that the GIFs allegedly appeared on their BBS. Playboy Magazine is publicly available material. Second, there is no arguing that the 412 GIFs produced by PEI are not substantially similar to the 412 PEI photographs in evidence. They are virtually exact reproductions.

Having satisfied these threshold requirements, Plaintiff can establish direct infringement by proving that Defendant *used* the accused copies in any of the ways described in Section 106 of the Copyright Statute. Under 17 U.S.C. § 106, a copyright owner has the exclusive right to, among other things: (a) reproduce the copyrighted work, (b) distribute copies of the copyrighted work to the public by sale or other transfer of ownership, and (c) display the copyrighted work publicly.

### A.

#### *Findings of Fact*

This court is bound to construe all of the evidence in a light most favorable to Defendants, the non-moving parties. In so doing, the court finds that Plaintiff has conclusively shown the following to be true: (1) in January of 1993, Defendants were operating a computer BBS; (2) prior to this date, Defendants adopted an incentive program to encourage their subscribers to upload information onto the BBS in order to increase the stockpile of information available to customers (Hardenburgh dep. p. 157); (3) information uploaded onto the system from subscribers' home computers was held in an upload file where it was briefly screened by RNE employees before it was released, by those employees, onto the general BBS; (Hardenburgh dep. p. 138–142); (4) Defendants had notice that PEI was in the habit of enforcing its copyrights against BBS owners (Hardenburgh dep. p. 192, Hardenburgh Aff. ¶ 5); (5) as of January 30, 1993, when the FBI Tapes were created, 412 GIFs were available on Defendants' general BBS which contained virtually exact reproductions of copyrighted photographs from Playboy Magazine. (Exhibit 2 to 1st Tesnakis Aff., Exhibit D to 2nd Tesnakis Aff.)

### B.

#### *Defendants' Arguments*

According to Defendants, the facts described above are insufficient to warrant a judgment of direct copyright infringement. First, they argue that they did not in any way usurp one of the protected rights of PEI as a copyright owner. Defendants claim that they did not "reproduce" copies of PEI photographs by simply providing an incentive to subscribers to upload electronic data onto the BBS. It was the subscribers who scanned the copyrighted photographs and turned them into electronic data, and it was subscribers who uploaded the information onto the system. Similarly, they claim that they never "distributed" PEI photographs to their customers because it was the customers *themselves* who chose whether or not to download the GIFs from the central system to their home computer. Defendants describe themselves as passive providers of the space in which the pictures were passed from one party to another. Defendants argue that they never "publicly displayed" PEI photographs either, because subscribers to the BBS could only view the GIFs on their own computers in the privacy of their own home, and only with the help of certain specialized software.

Defendants make a number of policy arguments as well. They point out that BBS

operators must develop methods of obtaining new information in order to stay competitive in the crowded on-line computer market. New customers will be drawn to the BBS or on-line service which provides the most information. The incentive system developed by RNE was a reasonable way, then, to maintain competitiveness and allow the company to grow. At the same time, they argue that it would have been impossible to police each and every uploaded file to ensure that it did not contain copyrighted material. While RNE employees could quickly view an uploaded file to determine whether it contained clearly inappropriate material such as, for instance, child pornography, it would be unthinkable to require these employees to determine the *source* of each and every photograph to ensure that there was no possibility of copyright infringement. To place such liability on the owners of a BBS, Defendants argue, is an excessive burden on the rights of free speech as embodied in the First Amendment.[2] In addition, they claim that such liability threatens to dismantle the computer on-line industry.

Even if, Defendants continue, the on-line industry as a whole is not destroyed by imposing copyright liability on service providers, such liability will irreversibly disadvantage local BBS owners in relation to massive on-line systems. Local BBS operators are less able to spread the cost of copyright liability to their more limited pool of subscribers. The outcome of a regime which imposes direct liability on owners of on-line systems, they warn, is the eventual extinction of local providers. Defendants claim that such an outcome could not be consistent with the primary objective of copyright law, which is "not to reward the labor of authors, but '[t]o promote the progress of Science and useful Arts.'" *Feist*, 499 U.S. at 349, 111 S.Ct. at 1290.

### C.

#### *Plaintiff's Arguments*

Plaintiff, on the other hand, argues that copyright laws are meant to protect copy-right owners from a situation in which their private material is used, without permission, by a non-owner for profit. Defendants, PEI claims, profited from a system in which PEI photographs were illegally provided to consumers who did not themselves purchase Playboy Magazine. Instead, these consumers purchased subscriptions to Rusty–N–Edie's BBS, and received the Playboy pictures for free.

Plaintiff notes that Defendants were aware that PEI was in the habit of enforcing its copyrights. Defendants should have, therefore, used their screening procedures to keep any and all PEI photographs off of the BBS. Instead, PEI asserts, Defendants adopted a policy of willful blindness, ignoring the strong likelihood that PEI pictures were being copied and sent onto the system, yet encouraging subscribers to continue to upload any and all photographs. Procedurally, RNE employees viewed each and every photograph that was uploaded onto the system, and then *moved* those photographs that were not discarded from the upload file to the central files where they became available to RNE customers. If direct copyright infringement carries with it a volitional element, Plaintiff argues, that requirement is satisfied by the participation of the RNE employees in the screening process.

In response to Defendants' policy arguments, Plaintiff admits that it may have been costly for Defendants to police their system to prevent copyrighted information from passing through it. Plaintiff asserts that it is more reasonable, however, to place the cost of protecting against copyright infringement on the parties who provide the system which facilitates infringement, rather than the innocent owner of the copyright. Even if this type of liability regime favors larger on-line providers, Plaintiff argues that the diversity of the on-line computer industry is not the responsibility of copyright owners. If Defendants cannot divine an efficient way to oper-

---

**2.** Defendants have not gone so far as to say that a finding of copyright liability in this case would result in a *deprivation* of their rights under the First Amendment. Defendants have rather asked the court to weigh the interests protected by the First Amendment in determining the applicability of the copyright statute to the facts before it.

ate a computer BBS free of copyrighted material, Plaintiff argues, then Defendants have the option of leaving the industry.

Plaintiff also points out, correctly, that a finding of direct copyright infringement carries no scienter requirement. PEI need not show that Defendants had any knowledge that PEI materials were available to their subscribers. PEI need only establish the threshold elements, ownership and copying, and that Defendants violated an exclusive right of a copyright owner.

According to Plaintiff, the mere fact that Defendants provided the space in which PEI photographs were copied and exchanged is sufficient to warrant a finding of direct copyright infringement. In the event that the court finds there is a further volitional requirement, PEI points to the screening procedures and the participation of RNE employees in moving PEI photographs onto the system. These facts, Plaintiff argues, establish Defendants' direct participation in the infringement which took place.

### D.

#### Case Law

The case law in this area is relatively sparse, and the matter is one of first impression in our circuit. The court offers a brief discussion of the major cases in the area, to provide a foundation for its decision today.

In *Playboy Enterprises v. Frena*, 839 F.Supp. 1552 (M.D.Fla.1993), District Judge Schlesinger was presented with facts not unlike those which are presently before this court. PEI had sued the owner of a BBS for direct and contributory copyright infringement because copies of its photographs were available to BBS subscribers. *Id.* at 1554. The defendant BBS owner argued that it was his subscribers, and not he, who had placed the photographs on the system. *Id.*

The differences between *Frena* and this case are few, but should be mentioned. First, in the *Frena* case, the defendant admitted that the photographs appeared on his BBS. There has been no such concession here, though Defendant has made no factual showing to the contrary. Second, and more importantly, there is no discussion in the *Frena* case of any screening procedure utilized by the defendant's BBS before uploads were released onto the general system. It appears that subscribers to Mr. Frena's BBS were able to upload information directly into the central files where they became immediately available to other subscribers. Mr. Frena, then, was even more of a passive participant in the copying and exchange of copyrighted photographs than are the Defendants in this case.

District Judge Schlesinger held that Mr. Frena was liable for direct copyright infringement. *Id.* at 1556–57. As in our case, PEI easily established the threshold elements of ownership/validity and copying. Moving on to the more difficult consideration, the court found that defendant had violated PEI's exclusive "distribution" and "display" rights. *Id.*

The court found that defendant had "distributed" PEI photographs simply by providing the space in which those photographs were uploaded and downloaded. The court stated that, "[t]here is no dispute that Defendant Frena supplied a product [the BBS] containing unauthorized copies of a copyrighted work. It does not matter that Defendant Frena claims he did not make the copies itself [sic]." *Id.* at 1556. Judge Schlesinger apparently felt that a finding of direct copyright infringement does not carry with it a volitional element, or, if it does, that such requirement was satisfied by defendant's past action of setting up the BBS.

In regard to the violation of PEI's "display" rights, the court defined the word broadly, to include:

> the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system.

*Id.* (citing H.R.Rep. No. 1476, 94th Cong., 2d Sess. 64 (Sept. 3., 1976), reprinted in U.S.Code Cong. & Admin. News 1976 p. 5659, 5677). The fact that PEI materials were only available to BBS subscribers did not change the public nature of the "display."

*Id.* (citations omitted). The court did not consider whether Mr. Frena was liable for contributory copyright infringement.

In *Sega Enterprises Ltd. v. Maphia*, 857 F.Supp. 679 (N.D.Cal.1994), a computer software company sued the owner of a BBS for copyright infringement because copyrighted video games were available to BBS subscribers. The court granted plaintiff's request for a preliminary injunction, finding that plaintiff had shown a likelihood of success on the merits with respect to its claims of direct *and* contributory copyright infringement. *Id.* at 686. Plaintiff had shown its ownership of valid copyrights, and had proven that its games were available on defendant's system. *Id.*

The court was explicit in its discussion of contributory copyright infringement, holding that defendant's knowledge and encouragement of the infringing activity was sufficient to establish contributory liability. *Id.* at 687. The court was less clear on the specific factors that led it to its finding of direct infringement. The court stated:

> Sega has established a prima facie case of direct copyright infringement under 17 U.S.C. § 501. Sega has established that unauthorized copies of its games are made when such games are uploaded to the MAPHIA bulletin board, here with the knowledge of Defendant Scherman. These copied games are thereby placed on the storage media of the electronic bulletin board by unknown users.
>
> Sega has established that unauthorized copies of these games are also made when they are downloaded to make additional copies by users, which copying is facilitated and encouraged by the MAPHIA bulletin board.

*Id.* at 686 (citations omitted). Because knowledge is not an element of direct infringement, the court seems to be saying, as in *Frena*, that the mere creation of a BBS is sufficient to establish direct infringement liability where copyrighted material appears on the system.

In *Religious Tech. Center v. Netcom On–Line Comm.*, 907 F.Supp. 1361 (N.D.Cal. 1995), District Judge Whyte departed from the reasoning of *Frena* and *Sega.* The owner of certain copyrighted religious material sued a BBS operator when the material was unlawfully copied and criticized on his BBS. The court in *Netcom,* however, refused to hold the BBS liable for *direct* infringement based simply on the creation of a space where infringing activity occurred. The court reasoned:

> Netcom's act of designing or implementing a system that automatically and uniformly creates temporary copies of all data sent through it is not unlike that of the owner of a copying machine who lets the public make copies with it. Although some of the people using the machine may directly infringe copyrights, courts analyze the machine under the rubric of contributory infringement, not direct infringement.

*Id.* at 1369. To impose direct infringement liability on a BBS where the operator did nothing more than provide space where information is exchanged, "would result in liability for every single ... server in the worldwide link of computers transmitting [subscriber's] message to every other computer." *Id.* Although the copyright statute creates a strict liability regime, the court noted that "there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Id.*

### E.

### *Defendants' Liability for Direct Copyright Infringement*

As a legal matter, the court would agree with Judge Whyte that a finding of direct copyright infringement requires some element of direct action or participation, for two primary reasons. First, the statute is cast in terms of *activities* which are reserved to copyright owners. 17 U.S.C. § 106. It follows that an infringer must *actually engage in* one of those activities in order to directly violate the statute. Setting up a computer bulletin board is not one of those activities. Merely *encouraging* or *facilitating* those activities is not proscribed by the statute. Second, it is the area of contributory liability which allows "the imposition of liability on certain parties who have not

themselves engaged in the infringing activity." *Sony Corp. v. Universal Studios, Inc.,* 464 U.S. 417, 435, 104 S.Ct. 774, 785, 78 L.Ed.2d 574 (1984) (footnote omitted). There would be no reason to bifurcate copyright liability into the separate categories of direct and contributory if any remote causal connection to copyright infringement could be analyzed under theories of direct infringement.

That being said, the facts in this case, unlike *Frena, Sega,* and *Netcom,* are sufficient to establish that Defendants *themselves* engaged in two of the activities reserved to copyright owners under 17 U.S.C. § 106. The court finds that Defendants *distributed and displayed* copies of PEI photographs in derogation of PEI's copyrights. This finding hinges on two crucial facts: (1) Defendants' policy of encouraging subscribers to upload files, including adult photographs, onto the system, and (2) Defendants' policy of using a screening procedure in which RNE employees *viewed* all files in the upload file and *moved them* into the generally available files for subscribers.

These two facts transform Defendants from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement. Defendants admit that they were operating a service where the quantity of adult files available to customers increased the attractiveness of the service. Defendants actively encouraged their subscribers to upload such files. Defendants had control over which files were discarded and which files were moved into the general system. Defendants knew that there was a possibility that PEI photographs were being uploaded onto the system, but failed to adopt procedures which ensured that any and all PEI photographs would be discarded. It is inconsistent to argue that one may actively encourage and control the uploading and dissemination of adult files, but cannot held liable for copyright violations because it is too difficult to determine which files infringe upon someone else's copyrights.

█ Distributing unlawful copies of a copyrighted work violates the copyright owner's distribution right and, as a result, consti-

tutes copyright infringement. *Hotaling v. Church of Jesus Christ of Latter Day Saints,* 118 F.3d 199, 203 (4th Cir.1997). In order to establish "distribution" of a copyrighted work, a party must show that an unlawful copy was disseminated "to the public." *National Car Rental v. Computer Associates,* 991 F.2d 426, 434 (8th Cir.1993). The phrase "to the public," in this sense, includes paying subscribers to an otherwise publicly available service. See *Thomas v. Pansy Ellen Products,* 672 F.Supp. 237, 240 (W.D.N.C.1987) (display at trade show was public even though limited to members); *Ackee Music, Inc. v. Williams,* 650 F.Supp. 653 (D.Kan. 1986) (performance of copyrighted songs at defendant's private club constituted public display). Defendants disseminated unlawful copies of PEI photographs to the public by adopting a policy in which RNE employees moved those copies to the generally available files instead of discarding them.

Similarly, Defendants violated PEI's right of public display. The comment to 17 U.S.C. § 106 states that a display is public if "it takes place 'at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances are gathered.'" H.R.Rep. No. 1476, 94th Cong., 2d Sess. 64 (Sept. 3, 1976), reprinted in U.S.Code Cong. & Admin. News 1976 p. 5659, 5677. "The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service." *Id.* Defendants displayed copies of PEI photographs to the public by adopting a policy which allowed their employees to place those photographs in files available to subscribers.

█ Defendant RNE, the corporate owner of "Rusty-N-Edie's BBS," is liable for direct copyright infringement based on its policies of active participation in the infringing activities. This summary judgment is also applicable to President Russ Hardenburgh. Mr. Hardenburgh may not use the corporate veil as a defense to this action.

In *Southern Bell Tel. & Tel. v. Associated Tel. Directory Publishers,* 756 F.2d 801 (11th

Cir.1985), the 11th Circuit Court of Appeals stated that "an individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement." *Id.* at 811; *Vitabiotics, Inc. v. Krupka,* 606 F.Supp. 779, 785 (E.D.N.Y.1984) (holding an individual defendant jointly liable with three corporations active in marketing infringing materials). PEI has shown that Mr. Hardenburgh is the president and sole shareholder of the defendant corporation. (Hardenburgh dep. pp. 20–21.) Mr. Hardenburgh is also a paid employee of the corporation. (*Id.* at 62.) He has the sole ability to hire and fire employees on behalf of the corporation, and receives royalties paid to him by the corporation. (*Id.* at 56, 64–69.) Mr. Hardenburgh has the authority, right and ability to control the content of the BBS and its operations. (*Id.* at 73–91.) The summary judgment of direct copyright infringement is equally applicable to the corporation RNE and its President, Mr. Hardenburgh.

## II.

### Contributory Copyright Infringement

A party shall be liable for contributory copyright infringement where it, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publishing Corp. v. Columbia Artists,* 443 F.2d 1159, 1162 (2d Cir.1971). In *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), the Supreme Court stated that:

> [t]he absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringement on certain parties who have not themselves engaged in the infringing activity. For vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just

to hold an individual liable for the actions of another.

*Id.* at 435, 104 S.Ct. at 785.

The recent 9th circuit case of *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir.1996) is instructive. In *Fonovisa,* the District Court had granted summary judgment in favor of defendant, who operated a "swap meet" where consumers purchased merchandise from individual and independent vendors. Plaintiff sued defendant for providing the space in which its copyrighted material was illegally sold, but the District Court concluded that there was no liability for contributory infringement where defendant had neither supervised nor directly profited from the vendors' sales. *Id.* at 262. The 9th Circuit reversed the District Court's dismissal, holding that contributory liability could attach where "infringing performances enhance the attractiveness of the venue to potential customers" *Id.* at 263; *Columbia Pictures Industries Inc. v. Aveco Inc.,* 800 F.2d 59 (3rd Cir.1986) (providing the site and facilities for known infringing activity is sufficient to establish contributory liability.)

In the present case, Defendants clearly induced, caused, and materially contributed to any infringing activity which took place on their BBS. Defendants admit that they encouraged subscribers to upload information including adult files. Defendants admit that they benefitted from having more files available to their customers. Also, Defendants had at least constructive knowledge that infringing activity was likely to be occurring on their BBS. Defendants were aware that PEI was enforcing its copyrights against BBS owners. Moreover, Playboy Magazine is one of the most famous and widely distributed adult publications in the world. It seems disingenuous for Defendants to assert that they were unaware that copies of photographs from Playboy Magazine were likely to find their way onto the BBS. Defendants are liable for contributory copyright infringement.

## III.

### Unfair Competition

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides:

(a)(1) Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which—

(A) is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The Sixth Circuit has not addressed the elements necessary to prove a Lanham Act claim. Recent case law establishes that the following must be shown in order to prevail: (1) the advertisements at issue are false or misleading and the advertisements actually deceived or had the tendency to deceive a substantial segment of the audience, (2) the deceptive or misleading portions of the advertisement were material, in other words they were likely to influence the purchasing decision, (3) defendant caused the advertised goods to enter interstate commerce, and (4) plaintiff has been or is likely to be injured either by direct diversion of sales from itself to defendant or by lessening the goodwill or acceptability its products enjoy with the buying public. *Telxon Corp. v. Symbol Technologies, Inc.*, 961 F.Supp. 1113, 1122 (N.D.Ohio 1996); *Hobart Corp. v. Welbilt Corp.*, 1989 WL 449696 (Oct. 4, 1989 N.D.Ohio) (quoting *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 213 (D.D.C.1989) (citing *Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777, 783 (N.D.Ill. 1974)); *U–Haul Int'l, Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1243 (D.Ariz.1981), aff'd, 681 F.2d 1159 (9th Cir.1982)).

Plaintiff has failed to satisfy at least one of these elements, that the deceptive or misleading portions of the copied photographs were material, that is, likely to influence the purchasing decision of BBS subscribers. Plaintiff has not shown that subscribers to "Rusty–N–Edie's BBS" were drawn to that system because they believed that the adult photographs contained therein were created by Defendants. Plaintiff has not shown that Defendants made any attempt, or had any incentive, to pass off PEI photographs as if they were created by "Rusty–N–Edie's," other than to avoid copyright liability. Plaintiff will need to produce further evidence at trial to prevail on its Lanham Act claim that Defendants misled consumers about the source of the images.

### Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is granted on its claims of direct and contributory copyright infringement against Defendants. Plaintiff's motion for summary judgment is denied on its claim of unfair competition under the Lanham Act. All remaining claims shall be set forth for trial. A final pre-trial conference will take place on Monday, January 26, 1998 at 1:30 p.m. Jury trial shall be scheduled to begin on February 3, 1998, with the parties on two-week standby.

IT IS SO ORDERED.