GREGORY, Circuit Judge,
dissenting:
While I largely agree with the majority’s careful explication of the direct infringement doctrine within the cybersphere post-DMCA, I cannot join the majority’s application of that law. First, I disagree with the majority’s characterizations of Loop-Net as “an analogue to the owner of a traditional copying machine whose customers pay a fixed amount per copy and operate the machine themselves to make copies,” ante at 550, and its comparison of the company to “an owner of a copy machine who has stationed a guard by the door to turn away customers who are attempting to duplicate clearly copyrighted works,” id. at 556. Specifically, these ill-fitting characterizations lead the majority to the erroneous conclusion that LoopNet is not liable for direct infringement despite its volitional screening process. Because I would hold that LoopNet engages in non-passive, volitional conduct with respect to the photographs on its website such that the Net-com defense does not apply, I respectfully dissent.
I
In examining whether LoopNet is a passive provider not subject to direct infringement liability, the majority conducts a comparison of LoopNet’s posting processes as to text and images. The majority properly recognizes, and CoStar does not dispute, that when a subscriber posts text to LoopNet’s website the process is completely passive. Indeed, whatever text the subscriber enters into LoopNet’s form is automatically uploaded to, and immediately accessible on, Loop-Net’s website. By contrast, when a subscriber wishes to post a photograph on the site, such posting is not automatic or immediate. Instead, the photograph is transferred to LoopNet’s computers where one of the company’s employees can review the photo to ensure (1) it is an image of commercial real estate, and (2) it is not an obviously copyrighted image.
At this stage of the process the LoopNet employee has a choice, he or she can reject the photograph because it does not comply with the above-noted criteria, or he or she can “accept” the photograph, at which time it becomes accessible on the subscriber’s web page to which the text was previously and automatically uploaded. The majority thus finds itself in a bind, namely how is this decision by the LoopNet employee whether or not to “accept” an image akin to the automated posting of text such that it, too, does not constitute direct infringement. The majority attempts to resolve this paradox by first admitting, “LoopNet engages in volitional conduct to block photographs,” ante at 556 (emphasis added), however, it reasons, “this conduct, which takes only seconds, does not amount to ‘copying,’ nor does it add volition to Loop-Net’s involvement in storing the copy. The employee’s look is so cursory as to be insignificant.... In performing this ga-tekeeping' function, LoopNet does not attempt to search out or select photographs for duplication; it merely prevents users from duplicating certain photographs.” Id. (first emphasis added). In so determining that LoopNet’s “gatekeeping function” does not expose it to direct infringement liability, I submit that the majority expands the non-volitional defense well beyond Netcom and subsequent holdings, and gives direct infringers in the commercial cybersphere far greater protections than they would be accorded in print and other more traditional media.
II
In Netcom, the court recognized that traditional strict liability copyright princi- *558 pies were ill-suited to cyberspace. See 907 F.Supp. at 1369-73. Bulletin board operators and other ISPs provided a forum for content, a truly open communicative space over which they exercised no control; in a sense, they were publishers who did not— and could not, because of their automated processes — review their own “publications.” In recognizing the realities of this new information domain, the Netcom court rejected copyright owners’ claims against an ISP, reasoning that the ISP did not take any affirmative action that resulted in copying plaintiffs’ works other than maintaining a system through which software automatically forwarded subscribers’ messages onto Usenet. See Netcom, 907 F.Supp. at 1368. The court observed that the ISP did not “initiate[] the copying,” and its system operated without any human interaction, thus “the mere fact that [the ISP’s] system incidentally makes temporary copies of plaintiffs’ works does not mean [the ISP] has caused the copying.” Id. at 1368-69. The Netcom court concluded: “Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking....” Id. at 1370. Accordingly, the Netcom rule was fashioned to protect computer systems that automatically transfer data with no realistic manner by which the operator can monitor content. See id. at 1369-70 (stating plaintiffs theory “would result in liability for every single Usenet server in the worldwide link of computers transmitting [the message] to every other computer. These parties, who are liable under plaintiffs’ theory, do no more than operate or implement a system that is essential if Usenet messages are to be widely distributed.” (emphasis added)); see also Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F.Supp.2d 1146, 1167 (C.D.Cal.2002) (“Computer technology, and in particular the Internet, has created a challenge to copyright’s strict liability scheme. Because of the architecture of the web and the workings of computer technology, almost any business that utilizes computer hardware to create access to the Internet or to store content may find its hardware creating or displaying infringing material as a result of decisions by third-parties (the system’s users) without the business doing any truly volitional actions.” (emphasis added)).
Since Netcom, courts have recognized that the non-volitional defense to direct infringement claims extends only to “passive” service providers, through which data flow is “automatic.” In ALS Scan, we stated of Netcom, “when an Internet provider serves, without human intervention, as a passive conduit for copyrighted material, it is not liable as a direct infringer.” 239 F.3d at 622 (Niemeyer, J.) (emphasis added); see also Playboy Enters., Inc. v. Webbworld, Inc., 991 F.Supp. 543, 552 (N.D.Tex.1997); Playboy Enters., Inc. v. Russ Hardenburgh, Inc., 982 F.Supp. 503, 513 (N.D.Ohio 1997). In this case, however, the majority profoundly deviates from the passivity approach.
The difference between LoopNet’s conduct in this case and the protection originally afforded by Netcom is illustrated by examining the Netcom court’s aforementioned statement that “Netcom did not take any affirmative action that directly resulted in copying plaintiffs’ works other than by installing and maintaining a system whereby software automatically forwards messages received from subscribers onto the Usenet, and temporarily stores copies on its system.” 907 F.Supp. at 1368 (emphasis added). Here, however, Loop-Net’s conduct with regard to the photos is anything but automatic. In contrast to the real estate property descriptions which are automatically uploaded to the website without any service provider input, the *559 photos cannot appear on LoopNet’s site without operator approval.
The majority tries to diminish the importance of this fact by arguing that the review is very brief and the reviewer presses a single button. At the heart of the review, however, is an inherently “volitional” action without which the subscriber’s photos would not be accessible. For every photograph submitted, a LoopNet employee must determine: (1) is this real estate and (2) does the photo comply — on its face, at least — with our terms and conditions. These inquiries are the antitheses of passive, automatic actions. See Russ Hardenburgh, Inc., 982 F.Supp. at 513 (denying Netcom immunity to BBS operator which (1) encouraged subscribers to upload files and (2) employed “a, screening 'procedure in which [the operator’s] employees viewed all files in the upload file and moved them into the generally available files for subscribers ” (emphasis added)); id. (stating those facts “transform Defendants from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement”); cf. Webbworld, Inc., 991 F.Supp. 543, 552 (N.D.Tex.1997) (refusing to apply Netcom immunity to defendant that “did not function as a mere provider of access,” but provided content and functioned as a “commercial destination within the Internet”). As the district court in Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F.Supp.2d at 1168, recently remarked “[t]he principle distilled from these [cyber direct infringement] cases is that defendants must actively engage in one of the activities recognized in the Copyright Act.” Similarly, we emphasized in ALS Scan, 239 F.3d at 622, it was the lack of “human intervention” which rendered Netcom a passive service provider. Here, however, humans employed by Lo-opNet limited the content of postings and screened and sometimes edited photos to keep quality consistent, thus taking the case far outside the previously understood scope of coverage for Netcom’s volitional defense.
The majority downplays LoopNet’s volition, and the break from previous application of the volitional defense, by focusing on the fact that it is the subscriber, not LoopNet, who begins the volitional process, ie., the subscriber is the initial direct infringer.[1] This distinction, however, is illusory, as I believe is demonstrated by analyzing Loop-Net’s actions through the hypothetical of a more traditional copyright context.
Consider the following example: Loop-Net Magazine is a for-profit publication freely distributed in curbside boxes that displays commercial real estate listings. LoopNet Magazine solicits listings from its readership, but neither the reader who submits the listing, nor the reader accessing the listing pays for the service. Instead, LoopNet Magazine subsists on advertising revenue and other products it sells through the publication. Readers may electronically submit textual listings, or those with text and graphics. When LoopNet Magazine receives a text listing, its computers automatically transfer the content into the template for the next is *560 sue. However, when a reader submits a photograph, he or she must submit a digital image and sign a terms and conditions release stating that he or she has not infringed the copyright of the image submitted. LoopNet Magazine employees engage in a quick review of the images to determine that they are, in fact, pictures of real estate and that no obvious copyright has been violated.
Reader X sends LoopNet Magazine text describing commercial office space for rent in New York City’s renowned Flatiron Building; the text describing the property is, of course, automatically inserted into the LoopNet Magazine template and is ready for publication. Reader X has also submitted a photograph of the Flatiron Building, and signs the terms and conditions form. Reader X knows, however, that she has not complied with the terms and conditions because the photo is not hers, rather it is Edward Steichen’s 1905 photograph, The Flatiron. LoopNet Magazine ’s Intern Y receives the photo of the Flatiron Building, notes Reader X has signed the terms and conditions, and evaluates the photo for a few seconds. Intern Y finds the image to be a beautiful depiction of the building, precisely the type of material LoopNet Magazine seeks to display, and does not recognize it as the copyrighted Steichen image. However, Intern Y finds that the image was “uploaded in a format that’s not correct,” so he takes steps to remedy the image “so that it can appear [in the publication] without any technical problems.” J.A. 175 (deposition testimony of Fed.R.Civ.P. Rule 80(b)(6) designee Dennis DeAndre, LoopNet’s CEO, regarding formatting in which the company sometimes engages after the screening process). Once properly formatted, the image appears in the next issue of LoopNet Magazine, and Steichen’s estate sues both Reader X and LoopNet Magazine for direct infringement. Is LoopNet Magazine relieved of direct infringement liability because its screening process was most brief, a simple “yes” or “no” inquiry conducted by an intern, followed by a formatting correction? Of course not,[2] but no different is the situation here.
That another person initiated the process which led to LoopNet’s infringement is of no consequence. LoopNet remains the pivotal volitional actor, “but for” whose action, the images would never appear on the website. Indeed, “volition” is defined as “the act of willing or choosing[;] the act of deciding (as on a course of action or an end to be striven for)[;] the exercise of the will ... [or] the termination of an act or exercise of choosing or willing[;] a state of decision or choice.” Webster’s Third New International Dictionary of the English Language, unabridged 2562 (1981). Under any analytical framework, LoopNet has engaged in active, volitional conduct; its employees make a conscious choice as to whether a given image will appear in its electronic publication, or whether the image will be deleted from the company’s system.[3] Nothing in the brief nature of *561 LoopNet’s review makes the company akin to a copy machine owner or a security guard by the owner’s door. LoopNet is the publisher of LoopNet Magazine in cy-berform; a volitional copier of images to whom direct infringement liability applies. Because I believe that the Netcom, volitional defense should focus on passivity and the automated nature of the act — not the fact that a user’s initial volition somehow exterminates liability for later volitional acts — I would reverse the district court. Accordingly, I respectfully dissent.

. The majority also seemingly attempts to garner support for its argument by implying that LoopNet is a "conduit! ] from or to would-be copiers [who] ha[s] no interest in the copy itself.” Ante at 551 (citing Doe v. GTE Corp., 347 F.3d 655, 659 (7th Cir.2003)). However, unlike the webhost in Doe v. GTE Corp., which was “an intermediary ... indifferent to the content of what it transmits,” 347 F.3d at 659, LoopNet has a deeply vested interest in its content. Its entire screening process takes place to further its commercial aims, ensuring that the photos which appear comply with the website's purpose, namely advertising commercial real estate.

. See generally Keeler Brass Co. v. Cont'l Brass Co., 862 F.2d 1063, 1065 (4th Cir.1988) (discussing elements of a direct infringement claim); see also Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62 (1st Cir.2002) (stating "if [defendant] distributed copies of [plaintiff's] copyrighted work, the act of distribution is a direct infringement itself, not an act of contributory or vicarious infringement”).

. The majority also attempts to argue that LoopNet has not made a "copy” of the image. In doing so, it largely accepts LoopNet’s argument that rather than copying the images, the company simply "moves” an image already stored by modifying the computer’s directory, thus transforming the image from one not accessible by users who "hit” the website to one that users can view. The majority states "downloading is a temporary, automatic re *561 sponse to the user's request, and the entire system functions solely to transmit the user’s data to the Internet.” Ante at 551; see also id. at 551. The majority's analysis, however, rests on a technicality that does not comport with reality. While LoopNet may not ''copy” the images in a traditional sense, the fact is that without LoopNet's volitional action, the subscriber's image would never be uploaded to the subscriber's webspace on the LoopNet site no matter how much that subscriber might desire to have the image so appear. See MAI Sys., Corp. v. Peak Computer, Inc., 991 F.2d 511, 519 (9th Cir.1993) (holding loading of data to RAM "creates a ‘copy’ under the Copyright Act”). Thus, LoopNet is in every sense a publisher controlling content. In short, it is LoopNet, not the subscriber, who has the final say in selecting and determining photographic content on the website.